HERBERT G. WHYTE and ALMAZ M. WHYTE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HERBERT G. WHYTE ASSOCIATES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Whyte v. Commissioner
Docket Nos. 7953-83, 7954-83.[1]
United States Tax Court
T.C. Memo 1986-486; 1986 Tax Ct. Memo LEXIS 114; 52 T.C.M. (CCH) 677; T.C.M. (RIA) 86486; September 29, 1986. Nathaniel Ruff, for the petitioners. Luanne S. DiMauro, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in Federal income tax and additions to *119 tax against petitioners Herbert G. Whyte, Almaz M. Whyte, and Herbert G. Whyte Associates, Inc. as follows: Tax Year
Additions to Tax
Petitioners
Docket No.
Ended
Deficiency
Sec. 6653(b) [2]
Herbert G. Whyte
& Almaz M. Whyte
7953-83
12/31/75
$6,789.77
$3,394.89
12/31/76
5,719.00
2,859.50
12/31/77
46,542.21
23,271.11
12/31/78
30,795.90
20,572.68
Herbert G. Whyte
Associates, Inc.
7954-83
8/31/75
$1,011.12
$505.56
8/31/76
5,919.28
[3] 2,959.64
8/31/77
647.01
323.51
8/31/78
77,653.63
38,826.82
After concessions, [4] the issues remaining for decision are: (1) Whether petitioner Almaz M. Whyte incurred an allowable expropriation loss during *120 1975, and if so, whether said loss may be deducted for that year and carried forward to the remaining years in issue; (2) whether petitioner Herbert G. Whyte Associates, Inc. is entitled, pursuant to section 162, to deduct certain expenses allegedly incurred in Jamaica during the years is issue; (3) whether petitioner Herbert G. Whyte or petitioner Herbert G. Whyte Associates, Inc., or both, are liable for additions to tax pursuant to section 6653(b) for each of the years in issue; and (4) whether respondent is barred from the assessment and collection of the deficiencies herein, due to the expiration of the applicable period of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. General Background
Petitioners Herbert G. Whyte ("petitioner") and Almaz M. Whyte ("Almaz") (collectively referred to as "petitioners"), husband and wife, resided in Gary, Indiana, at the *121 time the petition in docket No. 7953-83 was filed. Petitioners filed joint Federal income tax returns (Forms 1040) for each of the calendar years 1975 through 1978, using the cash method of accounting. For each of these years, the address shown on the returns was Gary, Indiana. The returns for each year claimed exemptions for petitioner, Almaz, and two children (with the exception of the 1978 return, which claimed an exemption for only one child), and claimed deductions for state and local income taxes, real estate taxes, state and local gasoline taxes, general sales taxes, and home mortgage interest payments. Petitioners each had social security numbers which were used on these returns, and for the years in issue they had a joint checking account. Each of the returns was timely filed, with the exception of the return for 1978, which was filed on May 31, 1979. A notice of deficiency covering each of these years was issued by respondent to petitioners on January 24, 1983. Almaz was born and raised in Ethiopia. She left Ethiopia in 1960, at the age of 16, to obtain schooling in England and the United States. While in the United States, she received a bachelor's degree in political *122 science and she is currently on a leave of absence from the University of Chicago, where she is working on her master's degree. She returned to Ethiopia in 1967 and remained there for the next five years. Almaz reentered the United States as a visitor on October 25, 1972. She was married to petitioner on October 1, 1973, and from that date until the time her Ethiopian properties were expropriated, [5] she did not return to Ethiopia. On June 25, 1975, Almaz applied to become a lawful permanent resident and she was granted that status on July 20, 1976. She remained in this capacity until her naturalization as a United States citizen on September 28, 1982. Though she was primarily a housewife during the years in issue, she was also employed by the Gary, Indiana, Manpower Administration during 1975. Almaz was a resident of the United States throughout 1975. Petitioner was born and raised in Jamaica, and stayed there until the age of 21. He obtained a University of Cambridge School Certificate from Waulgrove College in Jamaica in 1954, a Bachelors Degree in Civil Engineering from Howard University in Washington, D.C., in 1962, and thereafter, he received *123 a Masters Degree in Civil Engineering from Catholic University in Washington, D.C. In 1966, he received a scholarship from the British Government to attend Britton College of Technology, where he earned a post graduate diploma in traffic and highway engineering. While in England, petitioner attended the University of London, the University of Slough, and the Road Research Laboratory in Slough. After he completed his education, petitioner returned to Jamaica to work in the engineering field. Several years later he decided to seek employment in the United States. He entered the United States as a lawful permanent resident on March 21, 1969, and has remained in this capacity ever since. He worked at various engineering firms in this country until 1974, when he founded his own engineering firm, Herbert G. Whyte Associates, Inc. Petitioner Herbert G. Whyte Associates, Inc. (hereinafter referred to as the "Corporation") had its principal place of business in Gary, Indiana, at the time the petition was filed in docket No. 7954-83, and filed returns for the years in issue as follows: Taxable Year Ended
Filed
August 31, 1975
November 17, 1975
August 31, 1976
December 13, 1976
August 31, 1977
November 17, 1977
August 31, 1978
January 29, 1980
*124 A notice of deficiency was issued to the Corporation for each of these years on January 24, 1983. During the years in issue, petitioner was the sole shareholder and manager/president of the Corporation. Unreported Income and Improperly Claimed Deductions
The individual income tax returns for petitioners during the years in issue were prepared by Sylvester Goodson, an experienced public accountant. Goodson also prepared the income tax returns for the Corporation for the fiscal years ended August 31, 1975, August 31, 1976, and August 31, 1977. The return for the fiscal year ended August 31, 1978, was prepared by Terrence Bronowski. The accounting system for the Corporation was set up by Goodson. He established a cash disbursements journal, a payroll ledger, a general ledger, and a general journal. He also gave instructions on setting up an accounts receivable ledger. This system was designed so that the corporate tax returns would be prepared using the cash receipts and disbursements method of accounting. Goodson examined the deposits shown on the Corporation's bank statements in order to determine corporate income for each of the years in issue. Accurate depictions *125 of income in this manner necessarily depended on whether checks received by the Corporation were deposited into the corporate bank accounts. Though Goodson directed petitioner to deposit all of the corporate checks into the accounts, the following amounts were not deposited and were instead taken by petitioner for his own personal use: Tax Year Ended
Amount
August 31, 1975
$4,892.13
August 31, 1976
26,738.48
August 31, 1977
15,366.01
August 31, 1978
92,091.40
Corporate expenses were determined from check stubs, canceled checks, and invoices. The following amounts were deducted as either consulting expenses, education and seminar expenses, or repair expenses in the Corporation's returns, but were actually personal expenses of petitioner: Tax Year Ended
Amount
August 31, 1976
$1,300.00
August 31, 1977
5,130.00
August 31, 1978
[6] 52,365.00
As a result of the above transactions the Corporation underreported its income *126 as follows: Tax Year Ended
8/31/75
8/31/76
8/31/77
8/31/78
Unreported Gross Receipts
$4,892.13
$26,738.48
$15,366.01
$ 92,091.40
Personal Expenses
Improperly Claimed as
Business Deductions
1,300.00
5,130.00
52,365.00
Total [7]
$4,892.13
$28,038.48
$20,496.01
$144,456.40
Based upon the Corporation's failure to report the above income, as well as the false deductions claimed, respondent determined that petitioner received the following amounts of taxable dividend income: Tax Year Ended
Amount [8]
December 31, 1975
[9] $19,529.13
December 31, 1976
[9]  16,944.49
December 31, 1977
[9] 106,457.80
December 31, 1978
[9]  56,754.56
Petitioner is the same person who was the defendant in the criminal case *127 of United States of America v. Herbert G. Whyte, (N.D. Ind., docket No. H CR 81-00045). In that case, petitioner was charged with filing false Federal income tax returns for each of the years 1975 through 1978, in violation of section 7206(1). On March 22, 1982, a jury returned a guilty verdict on all of the charges against petitioner. On May 6, 1982, the United States District Court entered its judgment pursuant to the guilty verdict. This decision was affirmed by the United States Court of Appeals for the Seventh Circuit in United States v. Whyte,699 F.2d 375 (1983). The Alleged Jamaican Transactions
Patrick Penso attended Howard University in Washington, D.C. from 1952 until 1959, where he earned a Bachelor of Science Degree in Electrical Engineering. He met petitioner while both were attending Howard University, and they later worked together for the City of Kingston, Jamaica -- Penso as an engineering consultant, and petitioner as the City Traffic Engineer. In 1968, Penso founded Patern Engineering, Ltd., a Jamaica-based engineering firm. He continued as the managing director of this firm until the early part of 1976. The Corporation did *128 not claim as deductions in its returns any payments to Penso, for any of the years in issue. Roosevelt C. Thompson has been a commissioned land surveyor and housing developer in Jamaica since 1959. He has worked in all sections of Jamaica, as well as in the Cayman Islands. He is a member of the Land Surveyor's Association of Jamaica and serves on the permanent committee of the International Congress of Surveyors. Thompson received a diploma in Management Studies from the University of the West Indies. During the years in issue, Thompson owned a surveying firm in Jamaica with a permanent staff of approximately 15 people. He also owned two companies dealing with land development which sometimes employed as many as 100 to 120 persons. Thompson has been a friend of petitioner's since they met in Jamaica in 1967. The Corporation did not claim as deductions in its returns any payments to Thompson for any of the years in issue. Collin A. Husbands was a resident of Jamaica during the years in issue and has been employed there as a civil and consulting engineer for the last 20 years. He has a degree from London University, is a former member of the Institute of Engineers in Jamaica, *129 and is a member of the Institute of Prestressed Concrete in the United States. Husbands specializes in infra-structural work, with particular emphasis on the design of sewage drainage systems. Husbands knows petitioner very well. They met while petitioner was the City Engineer for Kingston, and Husbands worked for petitioner personally while petitioner was living in Jamaica. From July 1975 until November 1975, Husbands worked in Jamaica for the Corporation on a project involving the Gary, Indiana, Airport. For this project, Husbands designed the foundation for the airport tower, and designed a drainage system and a retention pond for the airport. Petitioner provided Husbands with the information required for this project so that it was unnecessary for Husbands to actually visit the worksite. The Corporation received a bill for this work, dated November 30, 1975, which provided as follows: For professional services rendered in connection with the design and preparation of detailed working drawings for the following: 1. Piled Foundations for Gary Airport Tower 2. Design of Drainage System for Gary Airport 3. Design Retention Pond As per agreement Amount Due, $31,155.00
*130 Yours Sincerely, Collin A. Husbands /s/ Collin A. Husbands, B.S.C. (Eng.) (Lond.), M.I.E.J., M.P.C.I. The bill bore a Collin A. Husbands & Associates letterhead and the entire $31,155 Jamaican Dollars [10] was paid by Robert Baugh, petitioner's Jamaican attorney, on December 5, 1975, with funds provided by petitioner on behalf of the Corporation. The Corporation did not claim this amount as a deduction in its returns for any of the years in issue. The Expropriation Loss
During the early part of 1973, Almaz's mother was the sole owner of 50 gashas [11] of land in Ethiopia. Of these, 30 gashas were located in the Lemu Subregion and 20 gashas were located in the Gore Subregion. Her mother died on May 25, 1973, and as a result, Almaz and her five siblings each inherited one-sixth, or 5 gashas (approximately 494.20 acres), of the land in Lemu and one-sixth, or 3.3 gashas (approximately 329.47 acres) of the land in Gore. They became the owners of this land in August 1973. *131 Ethiopia is primarily and agricultural country. Its main export is coffee, which constitutes approximately 70 percent of all exports. Lemu and Gore are two of the prime coffee-growing areas in Ethiopia. The Lemu land involved here was fertile, was situated near a river which could be used for irrigation, and in 1973, produced about 30 metric tons of coffee per gasha. The land involved in Gore was less accessible, but it still produced approximately 25 metric tons of coffee per gasha in 1973. Both the land in Lemu and the land in Gore were managed by Almaz's father. As Almaz was not in Ethiopia at the time of her inheritance, she signed a power of attorney, authorizing her father [12] to perform these managerial duties, at the Ethiopian Embassy in Washington, D.C. Almaz corresponded with her father regarding the condition of the land, the coffee market, and the operation of the land. Her father kept this information in books of account. Income from her land resulting from coffee sales in 1973 was deposited for Almaz by her father in a bank account in Ethiopia. She also received a small amount of income from the 1974 coffee sales, which *132 was similarly deposited in her Ethiopian bank account. Almaz was engaged in the trade or business of producing coffee at the time her Ethiopian properties were confiscated. During 1973, the Land Department of the Ministry of the Interior kept registers of all of the land in Ethiopia, showing the location, owner, and estimated value of each parcel. To arrive at the estimated value figures, a seven-person committee was appointed which was composed primarily of agriculture workers, laborers, land department employees, and the governor of each county. The committees then divided the land in each province into three categories and proceeded to value the land. This valuation process was repeated every 10 years, although generally only slight changes were made after the initial values were established. Once the values were determined, they were used as a basis for calculating land taxes and for calculating re-registration fees upon the sale of the property. The Gore and Lemu lands involved here, were both classified as Category 1 Land in the Land Register. The values shown in the Register for these lands, from 1973 until the properties were expropriated in 1975, were $40,000 per *133 gasha for the land in Gore, and $80,000 per gasha for the land in Lemu. This difference in value resulted from Gore's greater distance from the capital, Addis Ababa, the shipping point for all foreign exports. The value of the land at the time of Almaz's inheritance was $30,000 per gasha for the 3.3 gashas in Gore and $40,000 per gasha for the 5 gashas in Lemu, or a total value of $299,000. The government of Ethiopia underwent a dramatic change during 1974 and 1975. In February 1974, a revolution that ultimately toppled Emperor Haile Selassie was touched off by enlisted military men protesting pay and living conditions. Selassie, who was reduced to a figurehead in the February revolt, was completely deposed in September of that same year. He was replaced by a provisional military government. All of the rural lands in Ethiopia were confiscated without compensation by the new government as the result of a decree entered on March 4, 1975. The land which Almaz inherited from her mother was thus confiscated in 1975. She did not receive any compensation for this land. After the 1974 coup, records involving land ownership were removed from the public domain. The decree of March 4, 1975, destroyed *134 virtually all of the court records on land, including records of inheritance. As a result of the takeover, it became dangerous and extremely difficult, if not impossible, to obtain records regarding expropriated land. The new government also issued a regulation prohibiting the transfer of money outside Ethiopia. The expropriation loss was not claimed on petitioners' 1975 income tax return, nor any subsequent return. ULTIMATE FINDINGS OF FACT 1. Petitioner fraudulently underpaid at least part of his income taxes due for each of the years 1976, 1977, and 1978. 2. The Corporation fraudulently underpaid at least part of its income taxes due for each of the years 1975, 1977, and 1978. OPINION I. The Expropriation Loss
The first issue that we must resolve is whether petitioners incurred an allowable expropriation loss during 1975, and if so, whether said loss may be deducted for that year and carried forward to the remaining years in issue. Respondent raises four arguments in defense of his position that the expropriation loss is not allowable. They are: A. That Almaz was a nonresident alien at the time of the loss, and therefore, since the loss was not connected *135 with a trade or business in the United States, it is not allowable; B. that the loss is not allowable because it was not incurred in a trade or business; C. that petitioners have failed to establish the amount of the loss; and D. that because petitioners did not make a timely election under section 172(b)(3)(C)(ii) (as this section read during the years in issue), the loss is subject to being carried back to each of the three years preceding the loss, and thus, because petitioners have not demonstrated the loss would not have been absorbed in those years, it may not be carried forward to the years 1976 through 1978. A. Almaz's Residence
A resident alien individual is, in general, allowed deductions to the same extent as a citizen of the United States.[13]Secs. 1.1-1(b), 1.871-1(a), Income Tax Regs. A nonresident alien, on the other hand -- with limited exceptions not applicable here -- is allowed deductions only to the extent that the deductions are connected with income which is effectively connected with the conduct of a trade or business within the United States. Sec. 873(a); *136 Sec. 1.873-1, Income Tax Regs. Thus, because Almaz was an alien during 1975, and because the Ethiopian properties were not connected with a trade or business in the United States, petitioners will be allowed the benefits of the expropriation loss only if the loss took place after Almaz became a United States resident. See Ribas v. Commissioner,54 T.C. 1347, 1349 (1970). [14]
The issue of residency is factual and must be resolved through a consideration of all relevant facts and circumstances. Adams v. Commissioner,46 T.C. 352, 358 (1966); Jellinek v. Commissioner,36 T.C. 826, 834 (1961). As general guidelines for making the determination of residency, the regulations [15] provide that an alien actually present in the United States "who is not a mere transient or sojourner" is a resident *137 of the United States for income tax purposes. Whether he is a transient is determined by his "intentions with regard to the length and nature of his stay." One who comes to the United States "for a definite purpose which in its nature may be promptly accomplished" is a transient; but if his purpose is of such a nature that "an extended stay may be necessary for its accomplishment" and to that end the alien "makes his home temporarily in the United States," he becomes a resident even though he may at all times intend to return to his domicile. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States "in the absence of exceptional circumstances." In applying these guidelines, an alien, by reason of his alienage, is presumed to be a nonresident, but that presumption is a rebuttable one. Sec. 1.871-4, Income Tax Regs.[16] See Park v. Commissioner,79 T.C. 252, 286-287 (1982), affd. without published opinion 755 F.2d 181 (D.C. Cir. 1985). *138 To these general guidelines, it may be added that the term "residence" does not have the same meaning as "domicile," but to be a resident "does require that the taxpayer have some degree of permanent attachment for the country of which he is an alien." Jellinek v. Commissioner,supra at 834. In other words, some permanence of living within borders is necessary to establish residence. DelaBegassiere v. Commissioner,31 T.C. 1031, 1036 (1959), affd. per curiam 272 F.2d 709 (5th Cir. 1959). Relying on the above-quoted regulations, respondent contends that Almaz failed to overcome the rebuttable presumption of alien nonresidence, and that Almaz, an alien whose stay during 1975 was limited by immigration laws, did not demonstrate any exceptional circumstances which would allow classification as a resident. Petitioners dispute these contentions and argue that the evidence shows that Almaz was a resident during 1975. We think that the duration and nature of Almaz's stay clearly establishes that she was a United States resident for the entire 1975 calendar year. In reaching this conclusion, we begin with the fact that, when Almaz *139 was present in the United States during 1975, she was not a stranger in an alien land. She had previously received a Bachelor's Degree in Political Science in this country during the 1960's, and she then returned here as a visitor in 1972. On October 1, 1973, she was married to petitioner, who had been a lawful permanent resident of the United States since March 21, 1969. It is significant that from the time she was married, until the time her Ethiopian properties were expropriated, she did not return to Ethiopia. Focusing on 1975, there are many facts which indicate United States residency. During that year, Almaz and her husband physically resided with their two dependent children in Gary, Indiana.For that same year, they also jointly filed a Form 1040 (U.S. Individual Income Tax Return) as opposed to a Form 1040 NR (U.S. Nonresident Alien Income Tax Return). On this return, they claimed deductions for state and local income taxes, real estate taxes, state and local gasoline taxes, general sales taxes, and home mortgage interest payments. They had a joint checking account and each had social security numbers. Additionally, Almaz applied to become a lawful permanent resident *140 on June 25, 1975, and, though she was primarily a housewife during that year, she also worked for the Gary, Indiana Manpower Administration. Moreover, it was during this time period that her husband successfully established his own Indiana-based engineering firm. [17]
In light of these facts, as well as after a review of the entire record, we think that "exceptional circumstances" within the meaning of the last sentence of section 1.871-2(b), Income Tax Regs., have been shown, and that Almaz's ties with the United States were not transient, but instead, show that her stay in this country was "of such an extended nature as to constitute [her] a resident." Sec. 1.871-4(c)(2)(iii), Income Tax Regs. We therefore hold that Almaz was a resident of the United States throughout 1975. B. Trade or Business
A loss from expropriation is deductible in the case of an individual if the loss was *141 incurred in a trade or business or in a transaction entered into for profit. Secs. 165(a), 165(c)(1), 165(c)(2); Elek v. Commissioner,30 T.C. 731 (1958). [18]
Petitioners argue that Almaz, through her father, was engaged in the trade or business of growing coffee. Respondent takes the position that the evidence presented was insufficient to establish the existence of a trade or business, and that because Almaz was not involved in the operation of said lands, she cannot be considered to be engaged in a trade or business. The question of whether Almaz was engaged in a trade or business requires an examination of all of the facts involved in this case. Higgins v. Commissioner,312 U.S. 212, 217 (1941); Ditunno v. Commissioner,80 T.C. 362, 366-367 (1983). The burden of proof for this inquiry is on petitioners. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Here, the evidence proffered consists primarily of the testimony of Almaz and that of her *142 brother, Amha Mersie-Hazen. Almaz testified that while her mother was alive, people were hired by her mother to plant and harvest coffee from the land in issue and that during this time period the land produced income from the sale of coffee. [19] When Almaz inherited the land, she signed a power of attorney authorizing her father to perform these same managerial duties. Income from the properties was received by Almaz for coffee sales during 1973 and 1974, and deposited by her father in a bank account in Ethiopia. It is not significant that profits from the properties were not sent to Almaz in the United States. Almaz stated that large amounts of money could not be sent at one time and for that reason she had planned to return to Ethiopia. Further, after the change of government, the new government issued a regulation prohibiting the transfer of money outside of the country. [20] Almaz also testified that she corresponded with her father from time to time regarding the condition of the land, the coffee market, and the operation of the land. Farming information was kept by her father in books of account. *143 Amha Mersie-Hazen testified that he too received income from the coffee lands during 1973 and 1974 which was similarly deposited into a bank account for him in Ethiopia, but that the government regulation prevented him from ever receiving any of the money in the United States. He also indicated that he gave a power of attorney to his father to manage the land for him; that he was constantly appraised on the state of the coffee crops and the operation of the land; and that he personally examined the accounting records for the business sometime during 1974. More specifically, he stated that in 1973 the Lemu land produced approximately 30 metric tons of coffee per gasha, and the Gore land produced approximately 25 metric tons per gasha. We found these witnesses' testimony to be forthright, impressive, and entirely believeable. Though no documentary evidence was presented on this issue, in light of the constraints faced by petitioners in obtaining records from a hostile government, we are convinced that under the circumstances, the best available evidence [21] adequately demonstrates that Almaz [22] was engaged in the trade or business of producing coffee at the time her properties *144 were confiscated. *145 C. The Amount of the Deduction
To determine the amount of the deduction for the Ethiopian loss under section 165(a), we must look to section 165(b). Section 165(b) provides: Amount of Deduction. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. Section 1011, for our purposes, provides that the adjusted basis for determining gain or loss shall be the basis determined under other applicable sections of subchapter O, after certain prescribed adjustments not material here. Section 1014 (part of subchapter O) deals with the basis of property acquired from a decedent; and, as applicable here, it states that the basis of such property shall be the fair market value at the date of the decedent's death. Sec. 1014(a)(1). See Elliott v. Commissioner,40 T.C. 304, 312 (1963). Respondent initially argues, apparently based on statements made by Almaz at her husband's criminal trial, that Almaz *146 acquired the two Ethiopian properties by gift from her father rather than by inheritance.Thus, argues respondent, pursuant to section 1015 Almaz's bases in the properties would be the same as they were in the hands of her father (unless those bases were greater than the fair market value of the properties at the time of the gifts). Respondent's argument is without merit. The evidence in the record establishes that Almaz acquired the properties by way of inheritance and not by way of gift. At the trial in this case, Almaz testified that she inherited the land in question in August 1973, directly from her mother and shortly after her mother's death. More importantly, no less than three witnesses, other than Almaz, testified that she acquired the properties by way of inheritance. [23] In fact, one of these witnesses was actually present at the reading of Almaz's mother's will. Therefore, because the parcels were inherited by Almaz, their bases for loss purposes are their fair market values at the date of her mother's death, May 23, 1973. Sec. 1014(a)(1). *147 Fair market value has been defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. "All relevant facts and elements of value as of the applicable valuation date shall be considered in every case." Sec. 20.2031-1(b), Estate Tax Regs.; Estate of Cordeiro v. Commissioner,51 T.C. 195, 202 (1968). The burden of establishing value is on petitioners. Welch v. Helvering,supra;Rule 142(a). The evidence presented here included the testimony of five witnesses. Almaz testified that at the time of her inheritance, the value of the five gashas of land in Lemu was $40,000 per gasha and that the 3.3 gashas of land in Gore were worth $30,000 per gasha. Tsedale Yilma, a family friend of Almaz's, owned one gasha of land in Lemu and stated that its value during 1973 was $40,000. We did not find the testimony of these two witnesses to be particularly reliable in establishing values for the properties. Neither one seemed overly knowledgable as to coffee land, *148 or described the basis used in arriving at these particular values. In fact, as the record shows, neither of these witnesses ever visited the land in issue. The testimony of the remaining three witnesses, on the other hand, was substantially more worthy of belief. Amha Mersie-Hazen, Almaz's brother, also inherited 5 gashas of land in Lemu and 3.3 gashas of land in Gore. Mersie-Hazen visited the land on numerous occasions, he frequently reviewed the coffee production records, and he indicated that the average production of the Lemu land in 1973 was 30 metric tons of coffee per gasha, and that the production for the Gore land during this time period was 25 metric tons of coffee per gasha. He testified that coffee prices at this time averaged about $600-$700 per ton. It was in his interest to keep apprised of these figures because after he finished his undergraduate studies in agriculture, and received his masters degree in agricultural economics, he planned to return to Ethiopia to manage the family lands. In his opinion, the land in Lemu was prime coffee growing land and was worth about $40,000 per gasha.He thought the Gore land, which was slightly less accessible than the land *149 in Lemu but still prime coffee growing land, was worth $30,000 per gasha. Bekele Aberra was Vice Minister of the Interior for Ethiopia during 1973. His duties included supervising the Ethiopian Land Department. The Land Department kept registers which divided all the land in Ethiopia into three categories and estimated the value of the land in each category for tax purposes. The method of arriving at the value figures is set forth more fully in our findings, but as Aberra testified, the Land Department based its values primarily on whether the land was fertile or developed, and on the distance of the land from Addis Ababa, the shipping point for all foreign exports. Aberra was familiar with the land inherited by Almaz and testified that both the Lemu land and the Gore land were classified as Category 1. He testified that the land registers indicated the value for Category 1 Land in Lemu was $80,000 per gasha and that the value for Category 1 Land in Gore was $40,000 per gasha. This difference in value, he indicated, resulted from Gore's greater distance from Addis Ababa. John Spencer was the principal legal and foreign affairs advisor for the Ministry of Foreign Affairs in *150 Ethiopia from 1943 through 1960. He also was in Ethiopia again on an official capacity during 1973 and 1974. During his stay there he became generally familiar with the Ethiopian economy and Ethiopian agriculture. He stated that coffee was the core of the country's exports and estimated that in the early 70's the value of coffee land ranged between $10,000 to $40,000 per gasha. He distinguished the higher valued lands from the lower valued lands depending upon whether there was access to roads, intrusion of non-coffee bushes, the necessity of irrigation, and whether there was difficulty in obtaining help for cultivation. He indicated that Gore and Lemu were both prime coffee growing areas. In determining the bases of the coffee lands in this case, we are required to make a "Solomon-like" pronouncement which under normal circumstances would be one of quesstimation and inexactitude. See Georgia Ketteman Trust v. Commissioner,86 T.C. 91, 98 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). Our task here was made even more difficult by the fact that *151 the Ethiopian government destroyed all land and inheritance records after the land in question was expropriated. As was made clear at trial, it would have been dangerous, if not impossible, for petitioners to obtain this valuable information. Using the best means they had available, [24] however, petitioners presented us with credible witnesses who, in large part, corroborated each other's estimates of value. It is also significant that respondent made no effort to controvert these estimations. [25] After a careful examination of all of the evidence before us, we conclude that at the time of Almaz's mother's death the Lemu land had a fair market value of $40,000 per gasha and the Gore land had a fair market value of $30,000 per gasha. Accordingly, for purposes of determining the amount of the deduction, Almaz's basis in the Limu property was $200,000 and her basis in the Gore property was $99,000, when the property was expropriated in 1975. *152 D. Loss Carryover
The controversy here concerns petitioners' attempt to carry over the unused portion of their 1975 expropriation loss to the remaining years in issue. As they read during the years in issue, sections 172(b)(1)(A)(i) and section 172(b)(1)(B) provided that a net operating loss was required to be carried back three years and forward five years except in certain circumstances. One of those circumstances was spelled out in section 172(b)(1)(D), which provided that a foreign expropriation loss could be carried forward ten years, without any carryback. Section 172(b)(3)(C)(ii) provided that a taxpayer suffering a loss in a taxable year ending after December 31, 1963, and who was desirous of having that loss solely carried forward pursuant to section 172(b)(1)(D), must elect to do so "at such time and in such manner as the Secretary or his delegate by regulation prescribes." The regulations require an electing taxpayer to attach a statement to his/her return for the year of the expropriation loss (filed at the time the return was due, including extensions) containing, in part, a declaration that he/she elects to have section 172(b)(1)(D) apply. Sec. 1.172-11(c)(2) *153 and (3), Income Tax Regs.[26]
*154 The availability of the election under section 172(b)(3)(C) provides a taxpayer with the opportunity to obtain benefits only on certain specified conditions; therefore, the election must satisfy those conditions and thus "reflect the taxpayer's unequivocal agreement to take the benefits and burdens of" his choice. Valdes v. Commissioner,60 T.C. 910, 914 (1973). [27]
Here, petitioners did not even claim a deduction for the Ethiopian expropriation loss on their 1975 return, much less make an election to have the special ten-year carryforward rules apply. Thus we see no reason to allow them the benefits of the extended carryover period when they have not undertaken the burdens required in making an election. That they later realized that they would be better off with the special carryforward benefit cannot be automatically transmuted into an election to that effect. To hold otherwise would render the election provisions meaningless, and allow taxpayers to wait and see which years would be most beneficial before deciding whether to make the election. We therefore hold the special *155 carryforward provisions are not available to petitioners in the instant case. [28]
Having determined that the normal three-year carryback and five-year carryforward provisions of section 172(b)(1)(A)(i) and section 172(b)(1)(B) apply, we must next determine to what extent the Ethiopian loss may be carried forward to the remaining years in issue. This, in turn, depends on how much of the loss was absorbed in 1972, 1973, and 1974. Petitioners have failed to provide us with any evidence as to their net taxable United States income for the three prior years, thus making it impossible to determine how much of the loss is absorbed by the carryback provisions. [29] Therefore, because we cannot determine whether any or all of the loss was absorbed in the carryback period, we must conclude that petitioners have failed to prove that any amount thereof may *156 be carried forward to 1976, 1977, or 1978. Subject to the limitations of section 172, however, Almaz's expropriation loss in 1975 of $299,000 is available as a deduction to petitioners in that year alone. II. The Jamaican Expenses
The second issue for our determination is whether the Corporation is entitled, pursuant to section 162, to deduct certain expenses allegedly incurred in Jamaica. Petitioner claims that he used Jamaican funds to pay for work done for the Corporation in Jamaica. Specifically, petitioner claims that work was done for the Corporation in Jamaica by Patrick Penso, Roosevelt Thompson, and Collin Husbands. He claims that he paid Penso, on behalf of the Corporation, somewhere between 30,000 and 60,000 in Jamaican dollars and 5,000 in U.S. dollars; that he paid Thompson between 70,000 and 120,000 Jamaican dollars; and that he paid Husbands 31,155 Jamaican dollars. Respondent argues that the Corporation is not entitled to these deductions because they have not been sufficiently substantiated. The burden of proving the existence of these deductions is on the Corporation. Rule *157 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). With respect to the Penso expenses, the only evidence offered was the testimony of Penso and petitioner. No contracts, bills, or receipts for the work were produced; rather, petitioner claims to have lost all his records of the Jamaican deals in an office fire.We did not find petitioner to be a credible witness and therefore reject his self-serving and unreliable testimony. Penso testified that he was paid "mostly by check" for his dealings with petitioner, yet petitioner failed to offer any evidence of canceled checks or check stubs made out to Penso.Penso's testimony as to the dates and amounts of these alleged payments was vague and confusing. It reflects numerous memory lapses, and dates and amounts simply could not be ascertained. In light of the inconclusive nature of this evidence, we are of the opinion that petitioners have failed to meet their burden on this issue. The evidence proffered regarding the Thompson expenses consisted solely of the testimony of petitioner, Thompson, and Robert Baugh, petitioner's Jamaican lawyer. We found their brief and very general testimony to be unpersuasive. They *158 did not agree as to amount (Thompson and Baugh both claimed that the amount paid was 120,000 Jamaican dollars while petitioner claimed the amount was 70,000-80,000 Jamaican dollars) or date (Roosevelt and Baugh testified that the amounts were paid during 1977, while petitioner testified the amounts were paid during 1977 or 1978) of the expenditures, nor were they specific as to the nature of the work performed. The date the expenditures were allegedly incurred is particularly important in this case, because even if we were to assume that the expenses occurred in 1977, since the Corporation's tax year ended August 31, 1977, we have no way of knowing within which fiscal year the payment was made. It is also significant that at petitioner's criminal trial, Thompson testified that records of these expenses appeared in his company's books and bank statements, yet neither of these items were produced at the trial herein, nor was any explanation offered for their absence. We therefore hold that the Corporation has failed to meet its burden of proof as to these expenses. The proof regarding the expenses paid to Husbands was significantly better than that offered in connection with Thompson *159 or Penso. Here, unlike the other Jamaican expenses, we were presented with documentary evidence supporting the claimed payments. The evidence, a bill bearing a Collin A. Husbands & Associates letterhead, was specific as to the date of the billing (November 31, 1975), the amount (31,155 Jamaican dollars), and the services rendered (detailed working drawings were prepared for piled foundations for the Gary, Indiana, Airport tower; the design of the drainage system for the Gary Airport; and the design of a retention pond). The bill was signed by Husbands, and marked as paid by Baugh on December 12, 1975. This evidence was corroborated by the testimony of Husbands and Baugh. For these reasons, we are of the opinion that the Corporation should be allowed a deduction in the amount of 31,155 Jamaican dollars or $34,270.50 U.S. dollars for its taxable year ended August 31, 1976. III. Fraud
The third issue is whether petitioner or the Corporation, or both, are liable for additions to tax pursuant to section 6653(b) for each of the four taxable years in issue. Section 6653(b) provides, *160 in pertinent part, that "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Thus, the requirements of this section are: (1) an underpayment [30] and (2) that some part of this underpayment be due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Our determination that Almaz suffered a loss in the amount of $299,000 for the tax year ended December 31, 1975, eliminates the underpayment alleged against petitioners by respondent for that year.Hence, because respondent has not proven the existence of an underpayment for this year, the section 6653(b) addition must also be eliminated. Sec. 6653(b); Hebrank v. Commissioner,supra;D'Alise v. Commissioner,21 T.C. 511 (1954). [31]
*161 We reach a similar result regarding the Corporation for the tax year ended August 31, 1976. Our allowance of a $34,270.50 deduction to the Corporation for that year erases the alleged underpayment. Thus, because respondent has not established the existence of an underpayment, section 6653(b) may not be applied for this year. Sec. 6653(b); Hebrank v. Commissioner,supra;D'Alise v. Commissioner,supra.
The parties do not dispute that there were underpayments of tax for the years 1976, 1977, and 1978, with respect to petitioner, and the years 1975, 1977, and 1978, with respect to the Corporation. The controversy, therefore, centers on whether some part of each of these underpayments was due to fraud. Fraud, as envisioned by section 6653(b), is the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owed. Kotmair v. Commissioner, 86 T.C.     (filed June 19, 1986). See Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); *162 Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), modified 77 T.C. 324 (1981); McGee v. Commissioner,61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). Respondent has the burden to establish fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d at 1004; Webb v. Commissioner, 394 F.2d at 377; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Acker v. Commissioner,26 T.C. 107, 112-113 (1956), affd. in part, and revd. in part on other issues 258 F.2d 568 (6th Cir. 1958), affd. 361 U.S. 87 (1959). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied 379 U.S. 827 (1964); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), *163 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intent; therefore, the entire course of the taxpayer's conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,67 T.C. at 200; Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. at 105-106. With these well-established principles in mind we now turn to the facts before us. Petitioner asserts that he completely relied on his accountant to prepare accurate returns, and as such, the imposition of the fraud penalty in this case is improper. Respondent, on the other hand, argues that, based on the failure of petitioner to supply his accountant with all of the necessary tax return information, the substantial amounts of unreported income and false deductions, the failure of petitioner to fully cooperate with respondent's agents investigating his tax liabilities, *164 and the conviction of petitioner under section 7206(1), the fraud penalty must be sustained. Based upon the entire record in this case, we are of the opinion that respondent has clearly and convincingly proven that petitioner's understatements of income for the taxable years 1976 through 1978 were due to fraud. In so concluding, we found the cumulative weight of the following factors to be particularly persuasive: First. Petitioner failed to supply his accountant with all of the information necessary to adequately complete the returns. Petitioner correctly points out that a taxpayer's reliance on an accountant to prepare income tax returns may indicate an absence of fraudulent intent. Marinzulich v. Commissioner,31 T.C. 487 (1958). Reliance on others to prepare one's income tax return is not an acceptable defense to an allegation of fraud, however, where the taxpayer has failed to supply all of the necessary tax information. See, e.g., Foster v. Commissioner,391 F.2d 727 (4th Cir. 1968); Rau's Estate v. Commissioner,301 F.2d 51 (9th Cir. 1962), cert. denied 371 U.S. 823 (1962); Hicks Co. v. Commissioner,56 T.C. 982, 1026-1027 (1971), *165 affd. 470 F.2d 87 (1st Cir. 1972); Parsons v. Commissioner,43 T.C. 378, 395 (1964); Bilsky v. Commissioner,31 T.C. 35, 44-45 (1958). [32]
In the instant matter, Goodson, petitioner's accountant, prepared the Corporation's income tax returns using the cash method of accounting. Under this method, he determined the Corporation's gross income by examining the deposits shown on the corporate bank statements. Of course, the accuracy of the gross income figure obviously depended on whether the corporate checks were deposited into the corporate bank accounts. Petitioner was instructed by Goodson to deposit these checks into the corporate accounts, yet, as is indicated in our findings, substantial amounts of corporate funds were never deposited. Instead, these funds were diverted by petitioner for his own personal use. In this fashion, petitioner concealed from his *166 accountant large amounts of income which, but for petitioner's malfeasance, would have been properly reported. Petitioner claims, nevertheless, that this unreported income did appear on the Corporation's accounts receivable ledger, and that Goodson should have reviewed the ledger in arriving at the amounts of income on the tax returns. [33] This claim is meritless. As the Corporation's books were maintained on the cash basis, Goodson was correct to review actual corporate receipts rather than corporate receivables in arriving at corporate gross income. Though a more in-depth review may have revealed the omitted income, the fact remains, that if petitioner had complied with Goodson's instructions, then the unreported income would have appeared on the tax returns. It is also significant that petitioner indicated to one of respondent's agents that he reviewed both the corporate and individual income tax returns with his accountant, and was aware of all of the income and expenses on the returns. Based on these facts, we find it highly unlikely that petitioner, a highly educated and successful businessman, was unaware of the large amounts of unreported income. Nor has petitioner offered *167 any satisfactory explanation as to why, having diverted corporate receipts to his own use, such amounts were omitted from his personal returns. There is other evidence indicating that Goodson was misled by petitioner. Goodson determined corporate expenses from check stubs, canceled checks, and invoices. As is indicated in our findings, however, the following amounts were listed as either consulting expenses, education and seminar expenses, or repairs *168 expenses, but in fact, were personal expenses of petitioner: Tax Year Ended
Amount
August 31, 1976
$1,300
August 31, 1977
5,130
August 31, 1978
52,365
We find it hard to believe that these improperly claimed deductions were attributable to petitioner's accountant. Petitioner's business success, his understanding of his business, as exhibited at trial, and his review of the returns in issue, convince us that he was substantially better informed on these matters than he wished us to believe. In short, we have been presented with evidence that clearly and convincingly establishes that petitioner neither supplied his accountant with all of the information necessary to complete the returns -- his own and the Corporation's -- nor did he accurately present the information that was provided. Second. Petitioner and the Corporation failed to report large amounts of income over a period of several years. It is apparent from this record -- and is conceded -- that petitioner and the Corporation failed to report substantial amounts of income for each of the taxable years 1975 through 1978, and as this Court has stated, "consistent understatements of income in *169 substantial amounts over a number of years by knowledgable taxpayers, standing alone, are persuasive evidence of fraudulent intent to evade taxes." Otsuki v. Commissioner,53 T.C. 96, 108 (1969). Third. Petitioner was convicted of filing false income tax returns. Petitioner was convicted under section 7206(1) [34] of filing false individual income tax returns for the taxable years 1975 through 1978. This conviction was affirmed in United States v. Whyte,699 F.2d 375 (7th Cir. 1983). Petitioner's conviction for these years does not conclusively establish his liability for the fraud additions, Wright v. Commissioner,84 T.C. 636 (1985), but it does collaterally estop petitioner from denying that he willfully and knowingly filed false income tax returns for the taxable years in issue by reason of omitting therefrom substantial amounts of income. It also remains relevant to and provides further evidence of petitioner's liability for fraud as to the taxable years 1976 through 1978. Wright v. Commissioner,supra,84 T.C. at 643. [35]
*170 In view of the foregoing, respondent's additions to tax for fraud against petitoner for the years 1976 through 1978 must be sustained. As for the Corporation, petitioners have conceded that if we uphold respondent's section 6653(b) determinations against petitioner, they must also be upheld as to the Corporation. Therefore, because we have found petitioner fraudulently underpaid his income taxes for the years 1976 through 1978, and because the fraud addition is not applied to the Corporation for 1976 (see supra), respondent's additions to tax for fraud are sustained against the Corporation for 1977 and 1978. For the Corporation's 1975 tax year we are also persuaded that respondent has clearly and convincingly proven fraud. Our reasoning is set out more fully, supra, but suffice it to say that we were again presented with evidence that petitioner was aware that corporate income was not reported and that petitioner misled his accountant as to what the correct amounts of income actually were. This was also the initial year in a series of years of substantial underreporting and a year where petitioner was convicted of filing a false income tax return (see supra). *171 These acts and omissions were commmitted by petitioner in his capacity as manager/president and sole stockholder of the Corporation; thus, under these circumstances, we must conclude that the Corporation is liable for the section 6653(b) addition to tax for the 1975 tax year. American Lithofold Corp. v. Commissioner,55 T.C. 904, 925 (1971); Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. on other issues per curiam 325 F.2d 1 (2d Cir. 1963); Auerbach Shoe Co. v. Commissioner,21 T.C. 191, 194 (1953), affd. 216 F.2d 693 (1st Cir. 1954). IV.Statute of Limitations
We have upheld the additions to tax for fraud for the years 1976, 1977, and 1978 as to petitioner, and the years 1975, 1977, and 1978 as to the Corporation. As such, respondent is not time-barred from assessing these years under the provisions of section 6501(c)(1). Estate of Temple v. Commissioner,67 T.C. 143 (1976). We did not find fraud as to the 1975 tax year of petitioner or as to the 1976 tax year of the Corporation, solely because of the absence of an underpayment of tax for those years. Accordingly, *172 because respondent did not issue his statutory notice for these years until after the three-year period of limitations, the assessment and collection of any deficiency for these years is barred by section 6501(a). As for 1978, the deficiency of the Corporation was determined within the applicable three-year period by respondent, and therefore was timely, even in the absence of fraud. Sec. 6501(a). Decisions will be entered under Rule 155.
Footnotes
1. These cases were consolidated pursuant to an Order of this Court dated September 30, 1985.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
3. Due to the determination of sec. 6653(b)↩ additions to tax, respondent abated a previously assessed delinquency addition (sec. 6651(a)(1)) of $43.74 and a previously assessed failure to pay addition (sec. 6651(a)(2)) of $2.28 for this tax year.
4. Respondent conceded on brief that petitioner Almaz M. Whyte is relieved from liability for the deficiencies and additions in docket No. 7953-83 pursuant to sec. 6013(e).↩
5. See infra.↩
6. Respondent inexplicably included in this figure a $2,407.00 check dated September 5, 1978 -- even though this tax year ended on August 31, 1978. Neither petitioners nor the Corporation contest this treatment.↩
7. To this extent, the adjustments to the Corporation's income are conceded, subject, however, to certain further claimed adjustments by the Corporation. See infra.↩
8. These adjustments to petitioner's income are conceded, subject, however, to certain further claimed adjustments by Almaz.See infra.↩
9. These figures vary from those concerning the Corporation, due to the differing taxable years.↩
10. Based on exchange rates existing at the time the bill was paid, this amount represents approximately $34,270.50 U.S. dollars.↩
11. One gasha equals 40 hectares or 98.84 acres.↩
12. Almaz's father died in 1978.↩
13. There are a few exceptions to the general rule that a resident alien is taxed the same as a United States citizen (see, e.g., secs. 901(b)(3), 901(c); 1.871-5, Income Tax Regs.). However, none of these applies in the instant matter.↩
14. See also Bello v. Commissioner,T.C. Memo. 1974-174↩.
15. Sec. 1.871-2 [Income Tax Regs.]. Determining Residence of Alien Individuals. (b) Residence defined.↩ An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws in not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances. 16. Sec. 1.871-4. Proof of Residence of Aliens. (a) Rules of Evidence. The following rules of evidence shall govern in determining whether or not al alien within the United States has acquired residence therein for purposes of the income tax. (b) Nonresidence Presumed. An alien, by reason of his alienage, is presumed to be a nonresident alien. (c) Presumption Rebutted. * * * The presumption as to the alien's nonresidence may be overcome by proof -- * * * (iii) Of acts and statements of the alien showing a definite intention to acquire residence in the United States or showing that his stay in the United States has been of such an extended nature as to constitute him a resident.↩
17. For a case involving somewhat similar facts where residency was found, see Lemery v. Commissioner,54 T.C. 480↩ (1970).
18. An expropriation loss does not come within the provisions of sec. 165(c)(3). Powers v. Commissioner,36 T.C. 1191↩ (1961).
19. At the criminal trial of petitioner, Gebre Kristos Mersie-Hazen, one of Almaz's other brothers, testified that the coffee plantation normally employed 40 to 50 workers, but that during the harvest season there could be as many as 500 employees. The transcript of testimony in the criminal trial was stipulated into evidence in the instant cases. ↩
20. It is often the case that such income is blocked by the foreign government. See Alvarez v. United States,431 F.2d 1261 (5th Cir. 1970), cert. denied 401 U.S. 913 (1971); Elek v. Commissioner,30 T.C. 731 (1958); Bibiloni v. Commissioner,T.C. Memo. 1973-284; Lajtha v. Commissioner,T.C. Memo. 1961-273↩.
21. See Benichou v. Commissioner,T.C. Memo. 1970-263↩. 22. Respondent's contention that it was necessary for Almaz to be involved in operating the lands is misplaced. It is well-settled that where an agent is acting on behalf of an owner in managing a business, the owner is still considered to be engaged in a trade or business. Alvary v. United States,302 F.2d 790, 796 (2d Cir. 1962); Reiner v. United States,222 F.2d 770 (7th Cir. 1955); Gilford v. Commissioner,201 F.2d 735, 736 (2d Cir. 1953), affg. a Memorandum Opinion of this Court; Pinchot v. Commissioner,113 F.2d 718, 719 (2d Cir. 1940); Elek v. Commissioner,supra at 733; Schwarcz v. Commissioner,24 T.C. 733, 739 (1955); Lajtha v. Commissioner,supra;Feiks v. Commissioner,T.C. Memo. 1958-120. This is true even where, as here, the owner does not perform any of the managerial functions. Jajtha v. Commissioner,supra. See, e.g., Gilford v. Commissioner,supra, wherein it was stated: Although it does not appear that the petitioner did anything herself in connection with the management of these eight buildings, an appreciable amount of time and work was necessarily required on the part of the managing agent. And if such management was a "trade or business" the petitioner was so engaged, although she acted only through an agent. [201 F.2d at 736↩.]
23. One of these three, Gebre Kristos mersie-Hazen, Almaz's brother, testified only at the criminal trial of petitioner.↩
24. See Benichou v. Commissioner,supra;Bello v. Commissioner,supra.↩
25. As we admonished the parties in Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980): each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently -- a fact of which has become increasingly important in light of the constantly expanding work load of the Court.↩
26. The relevant regulations provide as follows: Sec. 1.172-11. Election with Respect to Portion of Net Operating Loss Attributable to Foreign Expropriation Loss. (a) In General. -- If the taxpayer has a net operating loss for a taxable year ending after December 31, 1958, and if the foreign expropriation loss for such year (as defined in paragraph (b)(1) of this section) equals or exceeds 50 percent of the net operating loss for such year, then the taxpayer may elect (at the time and in the manner provided in paragraph (c)(1) or (2) of this section, whichever is applicable) to have the provisions of this section apply. * * * (c) Time and Manner of Making Election. -- (1) Taxable years ending after December 31, 1963. In the case of a taxpayer who has a foreign expropriation loss for a taxable year ending after December 31, 1963, the election referred to in paragraph (a) of this section shall be made by attaching to the taxpayer's income tax return (filed within the time prescribed by law, including extensions of time) for the taxable year of such foreign expropriation loss a statement containing the information required by subparagraph (3) of this paragraph. Such election shall be irrevocable after the due date (including extensions of time) of such return. * * * (3) Information Required. The statement referred in subparagraphs (1) and (2) of this paragraph shall contain the following information: (i) The name, address, and taxpayer account number of the taxpayer; (ii) A statement that the taxpayer elects under section 172(b)(3)(C)(ii) or (iii), whichever is applicable, to have section 172(b)(1)(D) of the Code apply; (iii) The amount of the net operating loss for the taxable year; and (iv) The amount of the foreign expropriation loss for the taxable year, including a schedule showing the computation of such foreign expropriation loss. In addition, if a taxpayer makes the election under subparagraph (2) of this paragraph, taxpayer shall specify the internal revenue district in which he filed his return for the three taxable years immediately preceding the taxable year of the foreign expropriation loss. If there is an increase or decrease in tax attributable to the election under subparagraph (2) of this paragraph for any taxable year preceding or succeeding the taxable year of the foreign expropriation loss, amended returns or claims for refunds should be filed with the office of the district director with whom the taxpayer filed his income return for the taxable year in which such election is made.↩
27. See also Pereira v. Commissioner,T.C. Memo. 1976-66↩.
28. For other cases where a special carryforward election was not allowed see Garcia-Carreras v. Commissioner,T.C. Memo. 1977-425; Pereira v. Commissioner,T.C. Memo. 1975-260; Bibiloni v. Commissioner,supra;Garrido v., Commissioner,T.C. Memo. 1973-143↩.
29. See Howse v. Commissioner,T.C. Memo. 1974-225↩.
30. The term "underpayment" is defined in sec. 6653(c) in essentially the same manner as the term "deficiency," which in turn is defined in sec. 6211↩, as the amount by which the tax imposed exceeds the amount of tax shown on the taxpayer's return.
31. See also Metas v. Commissioner,T.C. Memo. 1982-36↩.
32. See also Brenniser v. Commissioner,T.C. Memo. 1984-396; Russo v. Commissioner,T.C. Memo. 1975-268; Moor v. Commissioner,T.C. Memo. 1973-204; DeMartino v. Commissioner,T.C. Memo. 1954-188↩.
33. Despite the alleged importance of the accounts receivable ledger, it is noteworthy that there was no discussion of the ledger in the initial interview of petitioner by respondent's agent, nor was the ledger turned over in response to the initial subpoena issued by the Grand Jury investigating petitioner's tax liabilities. Respondent's agent first learned about the existence of the ledger after discussions with Elaine LaWell, petitioner's secretary. As a result of these discussions, the agent called petitioner and asked him whether an accounts receivable ledger existed. Petitioner replied that he did not know anything about it. It was not until after petitioner conferred with LaWell, that the ledger was finally produced.↩
34. Sec. 7206 provides in pertinent part that: Any person who -- (1) Declaration under penalties of perjury. -- Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under penalties of perjury, and which he does not believe to be true and correct as to every material matter; * * * shall be guilty of a felony * * *.↩
35. See also Boggs v. Commissioner,T.C. Memo. 1985-429↩.