JOSE C. & ESTELA O. BIBILONI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bibiloni v. Commissioner
Docket No. 4561-72.
United States Tax Court
T.C. Memo 1973-284; 1973 Tax Ct. Memo LEXIS 3; 32 T.C.M. (CCH) 1369; T.C.M. (RIA) 73284; December 27, 1973, Filed. Manuel Zaiac, for the petitioners. Paul R. Stanton, for the respondent. DAWSON
MEMORANDUM OPINION DAWSON, Judge: Respondent determined the *4 following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1967
$1,156.58
1968
1,381.41
The only issue for decision is whether the petitioners are entitled to net operating loss carryover deductions for the years 1967 and 1968 of a business loss for the value of property confiscated by the Cuban government after their departure from Cuba on October 5, 1962. All the facts have been stipulated by the parties. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. The pertinent facts are summarized below. Petitioners Jose C. Bibiloni and Estela O. Bibiloni are husband and wife whose legal residence was in Atlanta, Georgia, when they filed their petition in this proceeding. They filed their joint Federal income tax returns for 1967 and 1968 with the district director of internal revenue at Jacksonville, Florida. Petitioners were Cuban nationals until October 5, 1962, when they left Cuba, entered the United States and became resident aliens for Federal income tax purposes. Due to the political climate in Cuba, they had decided to leave Cuba indefinitely while the Castro government or a similar *5 regime was in power. In order to leave Cuba the petitioners had first applied in early 1962 for a 29-day exit permit as required by Cuban Resolution 454, promulgated September 29, 1961. Their application was granted on June 29, 1962, and shortly thereafter Cuban officials took an inventory of all their property. Immediately prior to their departure petitioners again underwent an inventory of all their property by Cuban officials and all their assets were accounted for in accordance with the list from the earlier inventory. If any assets were missing, petitioners would not have been permitted to leave Cuba. The purpose of the inventories was to prevent disposal by petitioners of their property to third parties prior to their exit from Cuba. Included among petitioners' assets was a 10 percent partnership interest in a pharmaceutical manufacturing firm, which was a going concern until seized by the Cuban government in late 1962 without payment or indemnification to the petitioners. After their arrival in the United States all of the petitioners' property in Cuba was confiscated by the Cuban government under authority of Cuban Law 989, promulgated December 5, 1961. Under this *6 law if citizens who had left Cuba under a 29-day exit permit did not return to Cuba after the expiration of 29 days, the Cuban government would assume they had abandoned Cuba and any property owned by them was thereafter confiscated. Petitioners have never returned to Cuba. The adjusted basis of the confiscated assets was $24,830, which they claimed as a business loss in 1962. On their Federal income tax returns for 1963, 1964, 1965 and 1966 petitioners have absorbed $17,618.85 of this loss. The amount of loss not absorbed by 1967 was $7,211.15 ($24,830 less $17,618.85) which petitioners here claim they may deduct as a net operating carry-forward loss on their 1967 and 1968 Federal income tax returns. Petitioners have not filed an election under section 172(b) (3) (C) (iii), Internal Revenue Code of 1954, [1] which permits the carry-forward of any Cuban expropriation loss for taxable years ending after December 31, 1958, to each of the 15 taxable years following the taxable year of such loss. On January 3, 1961, the United States *7 terminated diplomatic relations with Cuba and immediately prohibited travel to Cuba. When petitioners entered the United States and became resident aliens on October 5, 1962, they were simultaneously forbidden under operative Department of State regulations from returning to Cuba because their departure as aliens was deemed thereunder to be prejudicial to the interest of the United States. 22 C.F.R. § 46.3(k) (1973); 26 Fed. Reg. 482 (1961). Section 165(c) (1) allows a deduction for any loss sustained during the taxable year and not compensated by insurance if incurred in a trade or business. In the case of individuals, a net operating loss deduction is limited to losses attributable to the individual's trade or business. Section 172(d) (4). Such losses may be carried back 3 years and forward 5 years or until absorbed by taxable income in those years. Section 172(b). Petitioners claim that the loss of their 10 percent interest in the partnership of the pharmaceutical manufacturing firm by Cuban expropriation in 1962 was a business loss within the meaning of section 165(c) (1) and, therefore, may be carried forward as a net operating *8 loss under section 172(b) to the years 1967 and 1968. Since it has been stipulated that petitioners did not file an election under section 172(b) (3) (C) (iii), they may not carry forward any claimed loss under section 172(b) beyond the fifth succeeding taxable year which is 1967. Thus, petitioners are not entitled to deduct their unabsorbed loss against income they earned in the taxable year 1968. Consequently, respondent correctly disallowed petitioners' claimed net operating loss carryover to the taxable year 1968. On the other hand, petitioners are clearly entitled to deduct for the fifth succeeding taxable year (1967) the value of expropriation losses they carried forward from 1962 if their original loss was sustained after October 5, 1962, when they entered the United States as resident aliens for Federal income tax purposes. Cayetano R. Ribas, 54 T.C. 1347 (1970). Respondent would have us test petitioners' claimed loss by determining when their Cuban property became worthless and how completely they were dispossessed of their actual possession and control of such property when they entered the United States. Respondent argues that petitioners had only *9 bare legal title to their assets in Cuba which were totally worthless to them when they entered the United States as resident aliens. He asserts that the second inventory of petitioners' property, accompanied shortly thereafter by their actual departure, resulted in the loss of their practical control over their Cuban property. When they left Cuba the petitioners knew their property would be officially confiscated within 29 days if they did not return to Cuba. United States law prevented their return to Cuba during this 29-day period. Therefore, respondent argues that the petitioners left Cuba without any reasonable expectation of profit from the property they left behind. Without this anticipation of profit, it is urged, petitioners' Cuban property was not held after their departure from Cuba for use in a trade or business within the meaning of section 165(c) (1) and no loss deduction should be allowed for 1967. Hence respondent urges us to hold that any loss to petitioners was sustained prior to their entry as resident aliens into the United States. Acts of confiscation by the Cuban government are recognized by respondent as identifiable events resulting in closed and completed *10 transactions within the meaning of Treas. Reg. § 1.165-1(b). Such a confiscation is deemed to occur when a taxpayer is deprived of ownership of property or the normal attributes of ownership such as receipt of income and control over the operation or use of property with little or no chance of being compensated therefor. Where there is no official expropriation decree the date of loss may be established by whatever evidence is available. We have held that whether or not a confiscation has occurred is a question of fact depending upon the practicalities of ownership and control together with examination of a taxpayer's intent. Cayetano R. Ribas, supra at 1349. We hold that petitioners' Cuban property was confiscated within the meaning of section 165(c) (1) and therefore constituted a deductible business loss after they entered the United States as resident aliens on October 5, 1962. It is clear that the second inventory of petitioners' property by Cuban officials prior to their departure did not alter their control over this property. Nor were they divested of legal ownership of their property when they left Cuba soon thereafter. *11 The two inventories of petitioners' property were incidental to a course of action voluntarily decided upon by them, i.e., to leave Cuba. At any time prior to their departure they were free to reverse their decision and remain in Cuba. In that event their 29-day exit permit simply would have been canceled. Even when combined with their actual departure, the second inventory still does not acquire the character of an effective "confiscation" of petitioners' property. It is true that under Cuban Law 989 petitioners' failure to return within 29 days would result in confiscation of their property. But legally, until the end of the 29th day, the Cuban government could not take petitioners' property in any way. Furthermore, petitioners were free to return to Cuba in this 29-day period and all assets inventoried earlier would still be considered their property. Although United States law then in effect prohibited travel by aliens to Cuba, the petitioners correctly point out that they could easily have reentered Cuba by travel first to either Canada or Mexico which did not prohibit alien travel. As we noted in Cayetano R. Ribas, supra, petitioners' awareness that *12 their property could be confiscated at most indicates they had only a conditional intent to relinquish their properties when they entered the United States. We are not persuaded that they were aware of the restrictions under United States law which would prevent their return to Cuba before November 2, 1962, since no evidence was introduced regarding their knowledge of United States law. We cannot speculate whether they knew they would be unable to return to Cuba directly from the United States. As in the Ribas case, we will impute here neither an intent to abandon nor actual abandonment by petitioners of their Cuban property when they departed for the United States. We again find it significant that while seizure of petitioners' property under Cuban Law 989 was in the offing on October 5, 1962, it had not yet occurred. Plainly the assets in issue were used by petitioners in Cuba in a trade or business within the meaning of section 165(c) (1). However, respondent claims that petitioners retained no profit motivation as to this property once they left Cuba. In view of our conclusion that the petitioners had only a conditional intent to abandon their properties when they entered *13 the United States, we hold that their good faith expectation of profit from this property was retained at least until the time they became resident aliens. It is not significant that they received no profits from their Cuban property, for in many cases such income is blocked by the foreign government. See Alvarez v. United States, 431 F.2d 1261 (5th Cir. 1970), certiorari denied 401 U.S. 913 (1971); Peter S. Elek, 30 T.C. 731 (1958).
Accordingly, we conclude that petitioners were still owners of their Cuban property on October 5, 1962, and that their loss of such business property through confiscation by Cuban officials after they entered the United States as resident aliens entitles them to a net operating loss carryover deduction for the taxable year 1967. Decision will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩