Herbert G. WHYTE, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 87–2687.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1988.

Decided July 19, 1988.

---

Nathaniel Ruff, Merrillville, Ind., for petitioner-appellant.

Laurie Marie Conley, Asst. Atty. Gen., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WOOD, Jr., FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

The United States Tax Court entered judgment against Herbert G. Whyte for underpaying his federal income tax for the taxable years of 1976–78. The Tax Court also upheld the imposition of fraud penalties for these years. Whyte appeals, arguing that the Tax Court erred in not permitting him to carry forward an unreported foreign expropriation loss incurred in 1975 to offset his income tax deficiencies in 1976–78. We affirm.

I.

Whyte, a Jamaican citizen, holds a number of degrees in engineering and has been a lawful resident of the United States since 1969. From 1972–74 he worked as an engineer for various firms in the United States. In 1974 he started a wholly owned corporation, Herbert G. Whyte Associates, Inc., ("HWA") which provided engineering services to its clients. HWA filed federal income tax returns for the years 1975–78. Whyte and his wife, Almaz Whyte, also filed joint federal income tax returns for these years.

On January 24, 1983 the Internal Revenue Service ("the IRS") issued deficiency notices against both the Whytes and HWA for the tax years 1975–78.[1] The IRS asserted that during these years the Whytes had intentionally retained certain checks payable to HWA for their own personal use without properly reporting these amounts for income tax purposes. The IRS argued that the amounts represented by these checks should have been reported as gross income to HWA on its corporate tax returns and as dividend income from HWA to the Whytes on the Whytes' personal tax returns. The Whytes contested the deficiencies and the matter proceeded to trial.

At trial, the Tax Court determined that Whyte had fraudulently underpaid the Whytes' federal income tax for the years 1976–78. *Whyte v. Commissioner*, 52 T.C.M. 677, 689 (1986). Although the deficiencies and additions were assessed jointly against the Whytes, the IRS ultimately conceded that Almaz Whyte was relieved from liability under the innocent spouse provision set forth in § 6013(e).[2] Accordingly, the Tax Court entered judgment in favor of the government and against Whyte for both the income tax deficiencies and the related fraud penalties.[3] The Tax Court ruled, however, that the Whytes' unreported income for 1975 was offset by a

---

1. Whyte was previously *convicted of four* counts of filing false federal income tax returns for the years 1975–78 in violation of 26 U.S.C. § 7206(1). We affirmed his conviction in *United States v. Whyte*, 699 F.2d 375 (7th Cir.1983).

2. All statutory references are to the Internal Revenue Code as in effect during the years in issue. Section 6013(e) provides that if certain conditions are met, a spouse will not be held responsible for the underpayment of federal income taxes and attendant consequences even though he or she signed the couple's joint tax return.

3. The deficiencies in income taxes and additions to the taxes due were as follows:

| Taxable Year | Deficiencies Income Tax | Additions to Tax (§ 6653(b)) |
|---|---|---|
| 1975 | $ 0 | $ 0 |
| 1976 | 1,998.00 | 999.00 |
| 1977 | 36,468.21 | 18,234.11 |
| 1978 | 29,724.16 | 14,862.08 |

Section 6653(b) imposes a penalty if "any part of any underpayment ... of tax ... is due to fraud." Because the foreign expropriation loss more than offset Whyte's unreported income in

previously unreported foreign expropriation loss of $299,000. The Tax Court determined that in August, 1973 Almaz Whyte had inherited 8.3 gashas (approximately 820 acres) of land in Ethiopia which was used to grow coffee beans. The court further determined the Whytes' tax basis in this land was $299,000 and that it was confiscated without compensation in March, 1975 after the Ethiopian revolution. The Tax Court ruled that the Whytes were therefore entitled to claim the entire $299,000 as a foreign expropriation loss in 1975 as authorized by § 172(k) of the Internal Revenue Code.[4]

The amount of the loss the Whytes incurred in 1975, however, substantially exceeded their unreported income for that year and generated a "net operating loss." Section 172(b)(1)(A)(i) specifically provides that a net operating loss may be carried back to the three prior tax years, beginning with the year furthest removed from the year of the loss, and claimed as a deduction against that year's income.[5] If the amount of the net operating loss exceeds the income for that year as well, the excess may be claimed as a deduction against the income for the tax year two years removed from the loss and so forth. *United States v. Foster Lumber Co.*, 429 U.S. 32, 34, 97 S.Ct. 204, 206, 50 L.Ed.2d 199 (1976). If the net operating loss exceeds the taxpayer's total income for the three previous tax years, the unused portion of the net operating loss may be carried forward as a deduction against income for up to five years after the year of the loss, beginning with the year following the year of the loss. 26 U.S.C. § 172(b)(1)(B).[6] Any portion of the net operating loss remaining after this five year period cannot be deducted by the taxpayer and is effectively lost for tax purposes.

There is also, however, a special ten-year carryforward rule which may be applied to foreign expropriation losses. 26 U.S.C. § 172(b)(1)(D).[7] As an alternative to the general rule that net operating losses must be carried back three years and forward five years, a taxpayer who properly elects to do so may carry forward a net operating loss created by a foreign expropriation loss for ten years. Under this election none of the loss is carried back as a deduction against prior years' income.

Despite these provisions, the Tax Court ruled that Whyte was not entitled to carry forward any portion of the net operating loss created by the expropriation loss of 1975 to his 1976–78 tax years. The Tax Court first ruled that the Whytes failed to elect the special ten-year carryforward provision provided in § 172(b)(1)(D) in their 1975 federal tax return. They were therefore required to use the general rule providing for a three-year carryback and a five-year carryforward. At trial, however,

---

1975, there was no underpayment in that year and therefore no addition under § 6653(b).

**4.** Section 172(k) provided:
*Foreign Expropriation Loss Defined.*—For purposes of subsection (b)—
(1) The term "foreign expropriation loss" means, for any taxable year, the sum of the losses sustained by reason of the expropriation, intervention, seizure, or similar taking of property by the government of any foreign country, any political subdivision thereof, or any agency or instrumentality of the foregoing. For purposes of the preceding sentence, a debt which becomes worthless shall, to the extent of any deduction allowed under section 166(a), be treated as a loss.

**5.** Section 172(b) provides:
(1) *Year to which loss may be carried—*
(A)(i) Except as provided in clause (ii) and in subparagraphs (D), (E), (F), and (G), a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss.
(B) Except as provided in subparagraphs (C), (D), and (E), a net operating loss for any taxable year ending after December 31, 1955, shall be a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss.

**6.** *See supra* note 5.

**7.** Section 172(b)(1)(D) provides:
In the case of a taxpayer which has a foreign expropriation loss (as defined in subsection (k)) for any taxable year ending after December 31, 1958, the portion of the net operating loss for such year attributable to such foreign expropriation loss shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss and shall be a net operating loss carryover to each of the 10 taxable years following the taxable year of such loss. . . .

Whyte failed to introduce any evidence as to his and his wife's income for the years 1972–74. It was therefore impossible for the Tax Court to determine the amount of the net operating loss that should have been carried back and claimed as deductions in 1972–74. As a result, the amount of the net operating loss, if any, that was available to be carried forward to 1976–78 was unknown. The Tax Court reasoned that because it could not determine "whether any or all of the loss was absorbed in the carryback period, [it] must conclude that [Whyte] ... failed to prove that any amount thereof may be carried forward to 1976, 1977, or 1978." *Whyte*, 52 T.C.M. at 687. Whyte filed a motion for reconsideration urging the Tax Court to permit him to present evidence as to his and his wife's income for the years 1972–74. This motion was denied.

## II.

### A.

■ The first issue raised on appeal is whether Whyte should be permitted to elect the special ten-year carryforward provision set forth in § 172(b)(1)(D) or whether he may only use the general rule allowing a three-year carryback and a five-year carryforward. Section 172(b)(3)(C)(ii) provides that the ten-year expropriation loss carryforward is available only if "the taxpayer elects (at such time and in such manner as the secretary or his delegate by regulation prescribes) to have [§ 172(b)(1)(D)] apply." [8] The regulation promulgated pursuant to § 172(b)(3)(C)(ii)'s mandate specifies that this election "shall be made by attaching to the taxpayer's income tax return (*filed within the time prescribed by law including extensions of time*) *for taxable year of such foreign expropriation loss*," a statement indicating that the taxpayer is electing to have § 172(b)(1)(D) apply and which includes certain other required information. Treas. Reg. § 1.172–11(c)(1) (emphasis added).[9] The regulation further provides that "[s]uch election shall be irrevocable after the due date (including extensions of time) of such return." *Id.*

---

8. Section 172(b)(3) provides:
(C) Paragraph (1)(D) shall apply only if—
(i) the foreign expropriation loss (as defined in subsection (k)) for the taxable year equals or exceeds 50 percent of the net operating loss for the taxable year,
(ii) in the case of a foreign expropriation loss for a taxable year ending after December 31, 1963, the taxpayer elects (at such time and in such manner as the Secretary or his delegate by regulations prescribes) to have paragraph (1)(D) apply.

9. Treasury Regulation § 1.172–11 provides:
*Election with respect to portion of net operating loss attributable to foreign expropriation loss.*
(a) *In general.* If a taxpayer has a net operating loss for a taxable year ending after December 31, 1958, and if the foreign expropriation loss for such year (as defined in paragraph (b)(1) of this section) equals or exceeds 50 percent of the net operating loss for such year, then the taxpayer may elect (at the time and in the manner provided in paragraph (c)(1) or (2) of this section, whichever is applicable) to have the provisions of this section apply. If the taxpayer so elects, the portion of the net operating loss for such taxable year attributable (under paragraph (b)(2) of this section) to such foreign expropriation loss shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss and shall be a net operating loss carryover to each of the ten taxable years following the taxable year of such loss.

* * * * *

(c) *Time and manner of making election.*—(1) *Taxable years ending after December 31, 1963.* In the case of a taxpayer who has a foreign expropriation loss for a taxable year ending after December 31, 1963, the election referred to in paragraph (a) of this section shall be made by attaching to the taxpayer's income tax return (filed within the time prescribed by law, including extensions of time) for the taxable year of such foreign expropriation loss a statement containing the information required by subparagraph (3) of this paragraph. Such election shall be irrevocable after the due date (including extensions of time) of such return.

* * * * *

(3) *Information required.* The statement referred to in subparagraphs (1) and (2) of this paragraph shall contain the following information:
(i) The name, address, and taxpayer account number of the taxpayer;
(ii) A statement that the taxpayer elects under section 172(b)(3)(C)(ii) or (iii), whichever is applicable, to have section 172(b)(1)(D) of the Code apply;
(iii) The amount of the net operating loss for the taxable year; and
(iv) The amount of the foreign expropriation loss for the taxable year, including a schedule

There is no question that Whyte failed to make this election on the federal income tax return he filed with his wife for the 1975 tax year.[10] He failed to report the expropriation loss altogether, so naturally he did not claim the special carryforward provision. In the IRS's view, this ends the matter. Under the plain language of the regulation Whyte was required to make this election on the return he filed on behalf of himself and his wife in 1975, the year the expropriation loss occurred. Because Whyte failed to do so, the IRS contends that he has lost this opportunity.

Whyte acknowledges the force of the statute and regulation, but argues that his is a special situation. The Whytes' 1975 tax year was reopened in 1983 pursuant to § 6501(c)(1) & (2) which exempt from the three and six year statutes of limitation which generally govern IRS assessments those cases where the taxpayer has willfully attempted to evade the federal income tax. Whyte was allowed to claim the previously unreported foreign expropriation loss in 1975 only because the IRS reopened that tax year; the period for filing a refund had long since elapsed. Whyte therefore reasons that he should have also been permitted to make the ten-year carryforward election at this time. He argues that the policy underlying the election requirement dictates that it should not bar him from having § 172(b)(1)(D) apply to his case.

### B.

Section 172(b)(1)(D) was enacted in 1964 to assist taxpayers who suffered foreign expropriation losses by providing a longer time period in which to offset such losses. S.Rep. No. 830, 88th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.

News 1673, 1738 (1964–1 Cum.Bull. (pt. 2) 505, 569). Congress recognized that foreign expropriation losses were frequently substantial and that the general carryover rules were often inadequate to allow taxpayers to recoup these losses for tax purposes. *Id.* The statutory language of § 172(b)(3)(c)(ii) and the legislative history unequivocally indicate, however, that the taxpayer must elect to receive the benefit of the additional five-year carryforward afforded by § 172(b)(1)(D). In addition, the taxpayer who elects the ten-year carryforward must forego the three-year carryback period permitted by the general rule. Thus, a taxpayer with a large foreign expropriation loss must determine whether the additional five-year carryforward period provided by § 172(b)(1)(D) will be more beneficial than the three-year carryback authorized under the general rule.

There is also no serious question that Congress contemplated that the taxpayer would be forced to elect whether to have § 172(b)(1)(D) apply at a time when he or she would not know which alternative would ultimately be most beneficial. As previously noted, Treasury regulation § 1.172–11(c)(1), adopted pursuant to Congress' specific authorization, requires the taxpayer electing § 172(b)(1)(D)'s ten-year carryforward to do so in the year the foreign expropriation loss is incurred, and further provides that the election is irrevocable. Whyte does not claim that § 1.172–11(c)(1) is an unlawful implementation of the congressional mandate. Indeed, Congress later codified almost identical language when it enacted an analogous provision as part of the Tax Reform Act of 1976. *See* 26 U.S.C. § 172(b)(3)(E) (1977) (entitling taxpayers to elect to relinquish the three-

---

showing the computation of such foreign expropriation loss.

In addition, if a taxpayer makes the election under subparagraph (2) of this paragraph, taxpayer shall specify the internal revenue district in which he filed his return for the three taxable years immediately preceding the taxable year of the foreign expropriation loss. If there is an increase or decrease in tax attributable to the election under subparagraph (2) of this paragraph for any taxable year preceding or succeeding the taxable year of the foreign expropriation loss, amended returns or claims for re-

funds should be filed with the office of the district director with whom the taxpayer filed his income tax return for the taxable year in which such election is made.

**10.** Whyte has not offered any explanation for his failure to report the foreign expropriation loss in 1975, nor is there any indication whether the tax consequences of inheriting land used in a trade or business were recognized for tax purposes in prior years.

year carryback period authorized by the general rule).

The best explanation for the regulation's requirement that the taxpayer make his or her election in the year the foreign expropriation loss is incurred is that it is essential to effective administration of the income tax. *Valdes v. Commissioner*, 60 T.C. 910, 914–15 (1973). The election to have § 172(b)(1)(D) apply generates tax ramifications beyond those that result directly from the additional five-year carryforward. *Id. See also* S.Rep. No. 830, 88th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 1673, 1739 (1964–1 C.B. (Part II) at 570). In addition, by requiring the taxpayer to file the election in the year of the loss, the IRS is alerted at the outset to the need to maintain the necessary records to verify the taxpayer's subsequent returns. In other words, the present rules require taxpayers to guess which carryover rules will be most beneficial because it would be administratively unmanageable to allow taxpayers to wait out the optional ten-year carryforward period and then retroactively adjust the interim years' returns to reflect the most advantageous alternative.

Against this backdrop, we reject Whyte's argument that he should be permitted to elect § 172(b)(1)(D) even though he failed to do so in the return he filed in 1975. We do not agree with his contention that neither Congress nor the IRS contemplated his unique situation when the § 172(b)(1)(D) election rules were enacted, and that therefore the rules, despite their clear language, should not extend to his case. In essence Whyte is merely trying to adjust his tax returns for 1975–78 and his predicament is similar to the situation where a taxpayer attempts to elect the ten-year carryforward rule in an amended return or claim a refund after the time authorized in the regulation. Numerous cases have held that taxpayers who fail to timely elect § 172(b)(1)(D) are barred from doing so at a later date. *See, e.g., Valdes*, 60 T.C. at 914; *Garcia–Carreras v. Commissioner*, 36 T.C.M. 1738 (1977); *Pereira v. Commissioner*, 34 T.C.M. 1116 (1975); *Bibiloni v. Commissioner*, 32 T.C.M. 1369 (1973).

These cases emphasize that the election provisions contemplate that taxpayers will have to make a trade-off in uncertainty and that the election provisions would be rendered meaningless if taxpayers could alter their choice through a claim for a refund in later years. *Id. See also Young v. Commissioner*, 783 F.2d 1201, 1206 (5th Cir. 1986) (election to waive carryback period made on an amended return under an analogous statute held ineffective because the intent of the applicable year-of-the-loss requirement "was to require the taxpayer, when making the election, to assume the risk that a carryback would later prove preferable.").

Whyte attempts to distinguish these cases on the ground that he had not previously reported the expropriation loss at the time it occurred and therefore has never had an opportunity to elect the ten-year carryforward period. There are two further arguments implicit in his position. Because only the reopened years of 1976–78 are at issue and the IRS is fully scrutinizing these years anyway, the administrative burden to the IRS of permitting Whyte to elect the ten-year carryforward would be minimal. Additionally, because Whyte had no control over which tax years were reopened by the IRS, the hindsight concern (which in his view drives *Valdes* and its progeny) is inapplicable in his case. We address these three arguments in order.

First, Whyte fails to recognize the full import of the *Valdes* line of cases. There is no indication why the taxpayers in those cases failed to timely elect to have § 172(b)(1)(D) apply; they may have been unaware of the availability of the election. The point is that the system Congress enacted contemplates out of administrative necessity that a taxpayer's decision to elect the ten-year carryforward will be made when the taxpayer is uncertain as to which alternative will be most beneficial. The taxpayer's own ignorance cannot excuse the failure to make a timely election, regardless of whether he or she is ignorant only of the election opportunity or the tax consequences of the foreign expropriation loss itself.

This is so not only because it allows the taxpayer's error to improve his position, but also because it would be extremely difficult for the IRS to distinguish between those situations where actual inadvertence on the part of the taxpayer accounted for his or her failure to make a timely election and those situations where the taxpayer makes a strategic decision to delay in order to gain the benefit of hindsight. If we accepted Whyte's position and interpreted the applicable provisions to permit an election to be made when the expropriation loss was first reported, not in the year in which it occurred, taxpayers would be tempted, within the limits imposed by the rules governing refunds, to delay and report both the loss and the election in later years after it was clearer whether the carryback or the additional carryforward would be most beneficial. Although we recognize it is unlikely that a taxpayer would fail to report an expropriation loss in the year it was incurred in the hope that the IRS would later reopen that tax year enabling the taxpayer to make a more informed election decision, ignorance cannot excuse the failure to make a timely election.

Second, and most importantly, even assuming that the administrative concerns underlying the election requirement are not implicated in Whyte's case, we find Whyte's argument unpersuasive. It is not difficult to imagine that taxpayers, out of ignorance or otherwise, will fail to make timely elections; yet neither Congress nor the IRS has enacted an exception for those cases where the administrative burden might be less. Such a rule would be difficult to craft and even more difficult to implement. Further, there is no indication in the *Valdes* line of cases that the taxpayers' situations were administratively complex, yet none of the decisions even hinted at the possibility that this might excuse the failure to make a timely election. We decline to adopt such a rule.

Finally, Whyte's claim that taxpayers in his position cannot be aided by hindsight is incorrect. First, if for example the IRS had reopened all of the past fifteen tax years, Whyte, because of his failure to report the Ethiopian loss—a loss uniquely within his knowledge to report—would be able to utilize the election to his best advantage. Second, although a taxpayer cannot control which tax years, if any, the IRS will reopen, if he or she were permitted to elect § 172(b)(1)(D) at the time of the IRS's audit, the taxpayer would be able to utilize the election to allocate the foreign expropriation loss to the reopened tax years. Whyte, for example, only seeks to have the loss carried forward to 1976–78, tax years within the time period authorized by both the general carryover rule and § 172(b)(1)(D), but under the general rule the loss must be carried back to the years 1972–74 which have not been reopened. Accordingly, any loss allocated to offset Whyte's 1972–74 income would not benefit him and would only reduce the amount of the loss that could be carried forward to 1976–78, the reopened years. It would therefore be in his best interest to elect the ten-year carryforward provision. If on the other hand only 1972–75 had been reopened, Whyte would surely not be arguing so vehemently that the § 172(b)(1)(D) carryforward period should govern. We do not believe that this use of the election is consistent with the scheme adopted by Congress and the IRS.

### III.

Whyte also argues that the Tax Court erred in not permitting him to present his own testimony as to his taxable income for 1972–74 at a post-trial hearing, after he failed to do so at trial. Tax Court Rule 160 states that an omission by a party shall not be grounds for modifying an opinion unless "refusal to take such action appears to the court inconsistent with substantial justice." Whyte argues that the hearing he seeks would be short, the burden on the IRS and the Tax Court slight, and the consequences to him substantial. Whyte concedes that we must review the Tax Court's decision denying his motion under an abuse of discretion standard.

We hold that the Tax Court did not abuse its discretion in this case. Whyte had the burden of showing his entitlement to a net operating loss deduction in the years 1976–

78 and he failed to do so because he did not present any evidence as to his income for 1972–74. *See Hintz v. Commissioner*, 712 F.2d 281, 284 (7th Cir.1983) (taxpayer "bears the burden of showing that he or she is entitled to a particular deduction"). His only explanation for this failure was that the case was complex and that the focus of trial had been on establishing the 1975 foreign expropriation loss. This, however, would seem to cut against Whyte. The lion's share of the value of the foreign expropriation loss from Whyte's tax perspective depended on being able to carryover the loss to tax years besides 1975 and we find it difficult to understand why the application of these rules was not in the forefront of the trial. In these circumstances, we decline to second-guess the discretionary decision of the Tax Court. *See, e.g., Pepi Inc. v. Commissioner*, 448 F.2d 141, 147 (2nd Cir.1971) (Tax Court did not abuse discretion in denying a further hearing where the taxpayer offered no good reason for failing to call a witness). The decision of the Tax Court is AFFIRMED.