T.C. Memo. 1997-319


UNITED STATES TAX COURT


JAMES B. AND JOAN E. MURTAUGH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5181-95.                    Filed July 9, 1997.


Hedy Pollak Forspan and Mei Chen, for petitioners.

Drita Tonuzi, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes.

Petitioner James B. Murtaugh:

| Year | Deficiency | Addition to Tax Sec. 6651(a) | Addition to Tax Sec. 6654 |
|------|-----------|------------------------------|---------------------------|
| 1987 | $24,520 | $4,748 | $361 |
| 1988 | 20,939 | 3,124 | 738 |
| 1990 | 20,349 | 3,925 | 998 |
| 1991 | 6,737 | 1,460 | 331 |
| 1992 | 4,554 | 1,105 | 192 |

Petitioner Joan E. Murtaugh:

| Year | Deficiency | Addition to Tax Sec. 6651(a) | Addition to Tax Sec. 6654 |
|------|-----------|------------------------------|---------------------------|
| 1987 | $2,075 | $100 | $0 |
| 1988 | 1,901 | 29 | 0 |
| 1992 | 3,098 | 168 | 0 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The parties agree that petitioners are entitled to joint filing status. Petitioners filed all of their joint tax returns for the years in issue between May 1995 and March 1996, after the notices of deficiency in this case were issued. Petitioners submitted three returns for tax year 1990. Petitioners' tax returns reported the following information:

| Year | Return Date | Tax | Withholding | Overpayment |
|------|-------------|-----|-------------|-------------|
| 1987 | 5/11/95 | $5,515 | $7,208 | $1,693 |
| 1988 | 5/13/95 | 5,366 | 10,328 | 4,952 |
| 1990 | 1/15/96 | 5,564 | 6,919 | 1,355 |
| 1990 | 2/26/96 | 6,709 | 6,919 | 210 |
| 1990 | 3/15/96 | 5,942 | 6,919 | 977 |
| 1991 | 5/15/95 | 2,321 | 3,039 | 718 |
| 1992 | 5/16/95 | 0 | 2,563 | 2,563 |

The parties agree that if respondent prevails on the issues as stated below, the revised deficiencies and additions to tax will be as follows:

| Year | Statutory Deficiency | Deficiency/ (Overpayment) | Addition to Tax Sec. 6651(a) | Addition to Tax Sec. 6654 |
|------|----------------------|---------------------------|------------------------------|---------------------------|
| 1987 | $ 5,515 | ($1,693) | $ 0 | $ 0 |
| 1988 | 5,366 | (4,952) | 0 | |
| 1990 | 12,328 | 5,409 | 1,352 | 305 |
| 1991 | 2,321 | (718) | 0 | 0 |
| 1992 | 4,114 | 1,551 | 388 | 55 |

Petitioners concede that the overpayments are barred by section 6511(b)(2)(B).

We must decide the following issues:

(1) Whether petitioners are required to include, as ordinary income, the entire distribution of $25,313.22 received by James

Murtaugh from the Union Camp Corporation retirement plan for the taxable year 1990. We hold that petitioners are required to include the entire distribution as ordinary income.

(2) Whether petitioners are entitled to an ordinary, rather than a capital, loss in the amount of $59,700 from the foreclosure in 1992 of petitioners' two timeshare units in a resort lodging facility. We hold that petitioners are entitled to an ordinary loss.

(3) Whether petitioners are liable for additions to tax for failure to file and for failure to pay estimated tax. We hold that petitioners are liable for additions to tax to the extent provided in the opinion.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits. At the time of filing the petition, petitioners resided in Tuckahoe, New York.

Issue 1. Distribution Under a Qualified Plan

In 1990, petitioner James Murtaugh (petitioner) received a distribution from his qualified pension plan at Union Camp Corporation. The gross distribution from the pension plan was in the amount of $25,313.22, composed of an actual distribution of $16,203.29, and an amount of $9,109.93 that offset an outstanding loan principal. Petitioner received the gross distribution because he ceased employment with Union Camp and his

participation in the plan was terminated. At some point prior to the gross distribution petitioner had taken out a loan or loans from his pension plan account to pay for the education of petitioners' three children and to make improvements to petitioners' residence, resulting in the outstanding loan balance of $9,109.93 at the time of the gross distribution.

A statement of petitioner's pension plan account as of April 30, 1990, the effective date of petitioner's termination from the plan, indicated that there was an attached check in the amount of $16,203.29, and that the outstanding loan balance of $9,109.93 would be included in the gross distribution for purposes of determining taxable income. On the Form 1099R issued to petitioner, the plan administrator reported the gross distribution as a taxable distribution of $25,313.12, indicating that this amount included a defaulted loan of $9,109.93. The Form 1099R indicated that no amount of the gross distribution was eligible for a capital gains election.

All of petitioners' tax returns for the years in issue were submitted to the Internal Revenue Service after the notices of deficiency in this case were issued. Petitioners did not pay any tax for the 1990 taxable year except withholding tax. With respect to the 1990 taxable year, petitioners filed a tax return and two amended returns during the first 3 months of 1996. There are inconsistencies within each return, and inconsistencies between the returns. Petitioners' first tax return for 1990

(original return) was submitted in January 1996. On the original return, petitioners attempted to elect 5-year averaging and capital gains treatment. On the original return, petitioners reported a gross distribution of $25,313, indicating that $9,202 was the taxable amount and $3,324 was capital gain. Petitioners submitted an amended return for 1990 (first amended return) in February 1996, on which petitioners did not elect 5-year averaging or capital gains treatment. On the first amended return, petitioners reported a gross distribution of $25,313, indicating that $9,202 was the taxable amount. Petitioners submitted another amended return for 1990 (second amended return) in March 1996, on which petitioners attempted to elect 5-year averaging and capital gains treatment. On the second amended return, petitioners reported a gross distribution of $16,203, indicating that $12,706 was the taxable amount and $3,437 was capital gain.[1]

Issue 2. Capital or Ordinary Loss

On January 24, 1988, petitioners purchased a 25-percent timeshare interest in each of two condominium units (the timeshares) in B'Mae's Resort in Gilford, New Hampshire, a ski and lake resort area. The timeshares were purchased for a total of $89,700. During tax years 1988 and 1989, petitioners had

---

[1] We note that $12,706 plus $3,437 equals $16,143, not $16,203.

rental income from the timeshares of $3,480 and $3,579.36, respectively.

Prior to the purchase of the timeshares, petitioner had some previous experience with owning rental property. Petitioner had purchased a condominium on Cape Cod, Massachusetts, in 1985, and sold it in 1988 at a profit of around $20,000 to $25,000. Petitioner rented the Cape Cod property to one individual as a residence. Petitioner decided that he could do better by renting a property at $110-$150 per night, similar to a hotel or motel. Petitioner looked at properties in Orlando, Florida, and Myrtle Beach, South Carolina, and other places along the east coast. Petitioner's investigation revealed that southern locations were patronized heavily in the winter and lightly in the summer. Petitioner saw advantages with B'Mae's Resort. The resort was located on a resort lake, was close to snow skiing facilities, and was also a suitable venue for viewing fall foliage. Thus, petitioner expected it would be well patronized for several months out of the year. In addition, the timeshare interests offered for sale by B'Mae's were suites, and petitioner thought that suites, compared with single rooms, would be an advantage to families. When B'Mae's decided to add a new wing of condominiums and offered quarter (13-week) timeshare interests in the properties, petitioner decided to purchase the timeshares. Petitioner felt that the timeshares had a good potential for

generating cash-flow over and above expenses. Petitioner used profits from the sale of the Cape Cod property to purchase the timeshares.

B'Mae's was a resort hotel with approximately 24-30 total units, half of which were single rooms and half of which were suites. B'Mae's owned and rented out the single rooms itself, and offered the suites for sale as condominiums or timeshares. Petitioner had an agreement with B'Mae's whereby B'Mae's would manage the rental of the timeshares, including promotional advertising, rental contracts, housekeeping, replenishment of inventory, and guest registration, for a fee of 40 percent of rents paid. This was the standard agreement that B'Mae's had offered to other condominium owners for renting the suites. B'Mae's exclusively handled the rental of the timeshares. Petitioner did make people aware that he had the timeshares for rent, but no actual rentals occurred based on those efforts.

Petitioner visited the timeshares approximately once a year from 1988 to 1992. He stayed at one of the timeshares during his visits, usually for 2 nights and usually in the off-season. He did not use the pool or the lake when he visited the timeshares, although he would eat dinner and Sunday brunch at the resort facility. He once brought his daughter along and once brought his son. Petitioners did not take any depreciation on the timeshares. In preparing to buy the timeshares from B'Mae's,

petitioner did not prepare an economic projection or cash flow analysis, but he considered the number of days of rental and costs involved.

After 2 years, when it was clear that the rentals were not generating a positive cash flow, petitioner spoke with B'Mae's about why there were not more rentals. However, petitioner did not put much effort into trying to rent the timeshares on his own. For instance, he did not advertise. He made only one minor suggestion about improving the rentals. Petitioner only occasionally communicated with B'Mae's. For instance, B'Mae's contacted petitioner about using one of the timeshares during a telephone strike in New Hampshire. He did not maintain books and records for the timeshares other than the records he got from B'Mae's. He did not maintain a separate bank account for the timeshares. However, petitioner was engaged in a consulting activity separate from his job, and he maintained books and records and a separate account for the consulting activity. The primary source of petitioners' income during the years in issue was their wages.

B'Mae's had given petitioner some information, in the form of brochures, suggesting that petitioner did not need to be actively involved in the renting of the property for it to generate cash flow. Petitioner understood that B'Mae's would take care of all day-to-day aspects of renting the timeshares.

During tax year 1992, the Bank of New Hampshire foreclosed on the timeshares. Petitioners received $15,000 in proceeds for each unit, resulting in a loss totaling $59,700.

## OPINION

Petitioners have the burden of proof for all of the issues discussed below. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

## Issue 1. Distribution Under a Qualified Plan

Petitioners argue that the $9,109.93 amount of the outstanding loan proceeds was not income to them when the gross distribution was received.[2] We disagree. Petitioner received a gross distribution of $25,313.22 from his pension plan account, and this amount was reduced, or offset,[3] by the amount of the outstanding loan balance of $9,109.93. Petitioner received a check for only $16,203.29 because of the outstanding loan.

---

[2] For convenience, we occasionally refer to the loan or loans as a loan. We do not make a finding that this case involved one loan rather than multiple loans. As discussed <u>infra</u>, there is very little evidence about the loan or loans in question.

[3] A proposed regulation issued by respondent uses the term "plan loan offset" to refer to the amount of an outstanding loan that is deducted from the account balance upon distribution. Sec. 1.72(p)-1, Q&A-13, Proposed Income Tax Regs., 60 Fed Reg. 66233, 66237 (Dec. 21, 1995). Proposed regulations carry no more weight than a position advanced by respondent on brief. <u>F.W. Woolworth Co. v. Commissioner</u>, 54 T.C. 1233, 1265-1266 (1970). Our use of the word "offset" does not indicate any reliance on the proposed regulation.

Therefore, he in effect repaid the loan out of his pension plan account.

If the loan proceeds were taxed when first received by petitioner, taxing them at the time of the gross distribution would lead to double taxation of the same funds, a result generally to be avoided. See Campbell v. Commissioner, 108 T.C. 54, 67-68 (1997). However, petitioners are required to show that the loan proceeds were taxed when first received in order to avoid taxation at the time they were offset against the gross distribution, and they have not done so. Petitioners make no allegation or argument that the loan proceeds were taxed when first received, and the available evidence suggests otherwise. First of all, petitioner received a statement from the plan with respect to the gross distribution that indicated that the $9,109.93 loan proceeds would be included in the gross distribution for purposes of taxable income. Thus, the plan administrators believed, and so advised petitioner, that the loan proceeds were includable in income.

Moreover, it appears that the loan to petitioner was not income when received because it was a loan of $10,000 or less. In general a loan from a qualified plan to a plan participant is treated as a distribution from the plan under section 72(p)(1), and therefore included in income under section 72. See sec. 402(a). However, section 72(p)(2)(A) provides an exception to the general rule for certain loans, and petitioner's loan appears

to have satisfied the basic requirements of the exception. Petitioners have presented no evidence of the terms of the loan in question. Although we need not, and do not, make a finding to this effect, we think it probable that the loan to petitioner qualified for the exception. If the $9,109.93 loan fell under the exception of section 72(p)(2), it would not have been a distribution when received, but rather would have simply been a loan, not taxable to the borrower. Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 207 (1990). In any event, petitioners have presented no evidence to show that the loan was in fact includable in income when received. The mere fact that the loan proceeds were offset against the balance of petitioner's account before the gross distribution, so that petitioner received only $16,203.29, does not prevent the $9,109.93 from being income to petitioner.

Petitioners argue that section 72(e)(4)(A) provides the relief they seek. However, section 72(e)(4)(A) does not apply in this case. Section 72(e)(4)(A) applies if an individual "receives * * * any amount as a loan" under an annuity contract. Thus, if section 72(e)(4)(A) were to have any application on the facts of this case, it would have been when petitioners received the proceeds of the loan in question, not when the gross distribution was made. Moreover, section 72(e)(4)(A) merely designates loans under annuity contracts as amounts "not received as an annuity". Petitioners incorrectly conclude that any amount

not received as an annuity is not includable in income.  See sec. 72(e)(2)(B).

With respect to the actual distribution of $16,203.29, which petitioners agree must be included in income in some form, petitioners attempted to elect 5-year averaging and capital gains treatment in the second amended return for tax year 1990.[4] Respondent argues that petitioners do not qualify for either 5-year averaging or capital gains treatment because the elections were untimely, and that petitioners have failed to prove that they qualify for capital gains treatment in any event.

Section 402(e) permits a taxpayer to elect 5-year averaging. With 5-year averaging, the tax is imposed in the year of distribution, but the amount of the tax is equal to the tax on 1/5 of the distribution multiplied by 5, giving the taxpayer the advantage of lower tax rates on the smaller amount of income.[5] Under section 11.402(e)(4)(B)-1(c)(1), Temporary Income Tax Regs., 40 Fed. Reg. 1016 (Jan. 6, 1975), an election for 5-year averaging must be made within the time for filing a claim for

---

[4] The second amended return is the only return that can be read consistently with petitioners' position on brief.

[5] Sec. 402(e) permits 5-year averaging.  Prior to the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2085, sec. 402(e) of the Code as then in effect permitted 10-year averaging.  TRA 1986 prospectively eliminated 10-year averaging, but grandfathered the existing availability of 10-year averaging for persons who attained age 50 before Jan. 1, 1986.  See TRA 1986, sec. 1122(h)(5), 100 Stat. 2471-2472.  Respondent concedes on brief that petitioner had reached age 50 before Jan. 1, 1986. Nevertheless, petitioner sought to use 5-year averaging.

refund under section 6511.  See also section 1.402(e)-3(c)(1), Proposed Income Tax Regs., 40 Fed. Reg. 18810 (Apr. 30, 1975).[6] In this case, petitioners have stipulated that their claims for refund for tax years 1987, 1988, and 1991 were barred by section 6511(b)(2)(B).  Petitioners made no such stipulation with respect to tax year 1990.[7]  For tax year 1990, petitioners did not file a return until on or around January 15, 1996, and had not paid any tax by that date, except withholding tax.  Pursuant to section 6513(b)(1), petitioners are deemed to have paid the withholding tax on April 15, 1991.  Because petitioners did not file a return before receiving the notice of deficiency, the time period in which they must claim any refund is 2 years from the time the tax was paid.  See Commissioner v. Lundy, 516 U.S. ___, ___, 116 S.Ct. 647, 652 (1996).  Thus, when they filed their original return for tax year 1990 they were barred from claiming a refund. Consequently, under section 11.402(e)(4)(B)-1(c)(1), Temporary

---

[6] Respondent relies on the proposed regulations in her brief.  As already noted, proposed regulations carry no more weight than a position advanced by respondent on brief.  F.W. Woolworth Co. v. Commissioner, supra.  However, the temporary regulations, not cited by respondent, are identical, in all respects relevant for this case, to the proposed regulations. See Hall v. Commissioner, T.C. Memo. 1991-133.  In general temporary regulations remain in effect until replaced by final regulations or withdrawn.  Id.  The temporary regulations in this case have been neither replaced nor withdrawn, so we rely on them.

[7] Of course, petitioners did not allege that there was an overpayment with respect to tax year 1990, so there was no apparent need for such a stipulation.

Income Tax Regs., 40 Fed. Reg. 1016 (Jan. 6, 1975), petitioners are barred from electing 5-year averaging.[8]

Petitioners have also not demonstrated that they are eligible for capital gains treatment. They have presented no evidence or argument attempting to establish that they are entitled to capital gains treatment. Prior to 1986, section 402(a)(2) of the Code as then in effect permitted capital gains treatment for the portion of certain lump sum distributions from pension plans that was attributable to plan participation before 1974. The Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2085, prospectively eliminated capital gains treatment for lump sum distributions. However, taxpayers who attained age 50 before January 1, 1986, could elect to have the pre-TRA 1986 law apply. See TRA 1986, sec. 1122(h)(3)(A), (C), 100 Stat. 2470-2471. Respondent concedes on brief that petitioner had reached age 50 before January 1, 1986. Thus, petitioner meets the threshold requirement of the transitional relief. However, petitioner must still satisfy the requirements of the pre-TRA 1986 law in order to get capital gains treatment. Under the pre-TRA 1986 law, capital gains treatment was available only if the taxpayer was an active participant in the plan prior to January

---

[8] The same would be true if petitioners had attempted to elect 10-year averaging. Even if petitioners met the age requirement for the transitional relief provided in TRA 1986, sec. 1122(h)(5), 100 Stat. 2471-2472, application of that provision would still require a valid election under sec. 402(e)(4)(B).

1, 1974.  See sec. 402(a)(2) of the pre-TRA 1986 Code.

Petitioners have presented no evidence to show that petitioner

was a participant in the plan before January 1, 1974.  Therefore

petitioners have failed to prove that they are eligible for

capital gains treatment.  On the other hand, there is evidence in

the record supporting their ineligibility.  The Form 1099R that

petitioner received with respect to the gross distribution states

that no part of the gross distribution is eligible for capital

gains treatment.  We hold that petitioners are not eligible for

capital gains treatment with respect to any part of the gross

distribution.  Accordingly, petitioners must include the entire

$25,313.22 distribution as ordinary income during tax year 1990.

<u>Issue 2.  Capital or Ordinary Loss</u>

There is no question in this case that the foreclosure of

the timeshares was a sale or exchange under which loss was

realized, and hence recognized.  Sec. 1001(a) through (c);

<u>Helvering v. Hammell</u>, 311 U.S. 504 (1941).  The only question is

the character of that loss.  Section 1221(2) provides that

certain property used in a trade or business is not a capital

asset.[9]  The parties agree that this issue turns on whether the

_____

[9] The type of property to which sec. 1221(2) applies is
property of a character which is subject to the allowance for
depreciation, or real property, used in the taxpayer's trade or
business.  There is no evidence in this case concerning the
precise property interest that petitioners had in the timeshares.
For instance, there is no evidence establishing that the
timeshares were undivided partial fee interests, and therefore
                                          (continued...)

timeshares were used in a trade or business.  If so, petitioners are entitled to an ordinary loss; if not, petitioners must take a capital loss.

The Supreme Court has stated that

to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. * * *  [Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).]

On brief, respondent does not dispute that petitioner intended to make a profit as his primary purpose for acquiring the timeshares; respondent chooses instead to focus on other factors relating to the question of whether petitioner was engaged in a trade or business.  We find that petitioner's primary purpose for purchasing the timeshares was profit.  He chose B'Mae's not based on his personal preferences for a vacation spot but on what he thought would be a viable location for turning a profit.  He thought about the costs and potential rental income.  He visited the property only sparingly, and usually in the off-season.  His purpose for visiting the property was to check up on it, not to

_____

9(...continued)
real property.  See, e.g., Ames v. Commissioner, T.C. Memo. 1990-87, affd. without published opinion 937 F.2d 616 (10th Cir. 1991), affd. sub nom. Lukens v. Commissioner, 945 F.2d 92 (5th Cir. 1991), affd. without published opinion sub nom. Chesser v. Commissioner, 952 F.2d 411 (11th Cir. 1992), affd. sub nom. Hildebrand v. Commissioner, 967 F.2d 350 (9th Cir. 1992). Nonetheless, respondent does not dispute that the timeshares are included within the type of property to which sec. 1221(2) applies if such property is used in the taxpayer's trade or business.

take a vacation.  It is true that petitioners had other jobs and that they lost rather than made money on the timeshares, but we are persuaded that the primary purpose for purchasing the timeshares was to make a profit.

Merely because petitioner sought to make a profit does not mean that he was engaged in a trade or business.  To be engaged in a trade or business, there must be continuity and regularity to the activity.  Commissioner v. Groetzinger, supra; see Flint v. Stone Tracy Co., 220 U.S. 107, 171 (1911).  Respondent stresses that this case is appealable to the Court of Appeals for the Second Circuit and that we must, therefore, follow the law of the Second Circuit.  In this regard, respondent relies most heavily on Grier v. United States, 218 F.2d 603 (2d Cir. 1955), affg. per curiam 120 F.Supp. 395 (D. Conn. 1954).  Petitioner relies on three Tax Court cases and one Second Circuit case, Gilford v. Commissioner, 201 F.2d 735, 736 (2d Cir. 1953), affg. a Memorandum Opinion of this Court, and attempts to distinguish Grier from this case.

In Gilford, the taxpayer inherited fractional interests in several buildings in the 700 block of Third Avenue in New York City.  Two sisters of the taxpayer and another person acquired similar interests in the same manner as the taxpayer.  The taxpayer and the other owners hired a real estate firm to manage all the properties as a unit and to account to each owner for his or her share of income.  The Court of Appeals held:

Although it does not appear that the * * * [taxpayer] did anything herself in connection with the management of these * * * buildings, an appreciable amount of time and work was necessarily required on the part of the managing agent. And if such management was a "trade or business," the * * * [taxpayer] was so engaged although she acted only through an agent. [Gilford v. Commissioner, 201 F.2d 735, 736 (2d Cir. 1953).]

The principle of Gilford was more recently reaffirmed by this Court in Whyte v. Commissioner, T.C. Memo. 1986-486 n.22 ("It is well settled that where an agent is acting on behalf of an owner in managing a business, the owner is still considered to be engaged in a trade or business." (Emphasis added.)), affd. 852 F.2d 306 (7th Cir. 1988). We look to whether someone acting as an agent on behalf of petitioner to manage the timeshares was engaged in activities sufficient to rise to the level of a trade or business. We find that B'Mae's was engaged in a trade or business with respect to renting the timeshares. To use the language of the Court of Appeals, "an appreciable amount of time and work was necessarily required on the part of" B'Mae's. Gilford v. Commissioner, supra at 736. B'Mae's was in the business of operating a resort hotel, and this included renting its own single-room units. However, B'Mae's also managed the rental of the suite units, including timeshares, owned by others. B'Mae's took care of rental contracts, promotional advertising, housekeeping, replenishment of inventory, and guest registration. In short, B'Mae's' function with respect to the timeshares and to

other suites was similar to its function with respect to its own rooms.

We believe the record in this case, although sparse, establishes that B'Mae's was acting as petitioner's agent when it undertook the various activities incident to renting out the timeshares. Petitioner's uncontroverted testimony was that B'Mae's undertook the advertising, guest registration, housekeeping, and inventory replenishment in exchange for a fee equal to 40 percent of the proceeds of any rentals. Documents in evidence substantiate this fee arrangement.

Respondent argues that B'Mae's was a competitor of petitioners with respect to rentals at the resort. It is true that B'Mae's rented its own units as well as the timeshares of petitioners and units of other owners. However, B'Mae's could retain 40 percent of rent receipts on any rental of petitioners' timeshares, and B'Mae's had none of the risks of ownership. This was the standard arrangement that B'Mae's had offered to other owners. We think B'Mae's proposed and accepted a 40-percent fee because it was advantageous to B'Mae's, despite the fact that B'Mae's was also renting its own units. B'Mae's initially made money on the sale of suites to petitioners and the other owners, and the only way B'Mae's could continue to make money on the suites was to be paid for managing the rentals. Thus, B'Mae's had significant incentive to rent the timeshares. In addition,

B'Mae's was a good choice to manage the property. B'Mae's, unlike an independent manager, could spread the costs of advertisement among other suite owners and B'Mae's itself. Moreover, B'Mae's, unlike an independent manager, might receive unsolicited telephone calls about the availability of suites in the B'Mae's Resort. Finally, B'Mae's, unlike an independent manager, had access to and familiarity with the property for purposes of repairs and maintenance of the timeshares. We do not believe that the conflict of interest suggested by respondent affects our finding that B'Mae's was petitioner's agent.

On the other hand, the cases on which respondent relies, Grier and Balsamo v. Commissioner, T.C. Memo. 1987-477, are distinguishable from this case. In Grier, the taxpayer, a securities adviser and salesman, inherited a house that had previously been rented to a single tenant for a period of years, and the taxpayer continued this arrangement until he sold the house approximately 12 years later. During the taxpayer's ownership, he or his agent performed the necessary maintenance on the house. The District Court held that the house was not property used in a trade or business. In distinguishing Gilford, the District Court stated that the most important issue was "the extent of the regular and continuous activity of management involved" in the "multiple rental" in that case, which was not present in Grier itself, which involved a one-family house. Grier v. United States, 120 F.Supp. 395, 398 (D. Conn. 1954),

affd. 218 F.2d 603 (2d Cir. 1955).  The District Court pointed out that the activities with respect to renting the house were minimal, even though rental continued over a long period of time. Moreover, activity to rent or re-rent the house was not needed, and there were no employees regularly engaged for maintenance or repair.  Id.

In Balsamo, the issue was the proper characterization of the property in question, a single-family residence, that the taxpayer's husband had purchased before they were married.  When the taxpayer and her husband had married, she signed a prenuptial agreement.  Her husband died 5 months after the wedding.  Shortly after his death, the estate rented the property in question to a third party.  Subsequently, the taxpayer sued to challenge the prenuptial agreement, and in satisfaction of this suit, she received the property in question.  Within 3 months after receiving the property in question, the taxpayer sold it to the third party who had been renting it.

The Tax Court relied on Grier v. United States, supra, to hold that the taxpayer was not in a trade or business with respect to the property in question.  The taxpayer was a securities salesperson and secretary, and had little involvement with real estate.  She owned the property in question for a very short period of time.  Her activities with respect to the property as a rental property were almost nonexistent; even when the tenant pointed out a few problems, she did not attempt to

remedy them.  Essentially, the taxpayer treated the property not as a rental property but as an investment property to be sold in a short period of time.

In both Grier v. United States, supra, and Balsamo v. Commissioner, supra, neither the taxpayers themselves nor their agents had been sufficiently active with respect to the real property involved to be engaged in a trade or business.  In Gilford v. Commissioner, supra, the agents were actively involved in managing commercial real property, to a sufficient degree to be engaged in a trade or business.  In the present case, the transient rentals of petitioners' property likewise entailed sufficient activities to constitute a trade or business, and while these activities were conducted by B'Mae's, they are attributable to petitioners for purposes of determining whether petitioners were engaged in a trade or business.  Petitioner bought the timeshares after investigating various options and personally checked up on them in the years that followed.

We conclude that petitioners were engaged in a trade or business with respect to the timeshares and are entitled to ordinary loss treatment upon their disposition.

Issue 3.  Additions to Tax

The parties have stipulated that if respondent prevails on the issues discussed above, then petitioners are liable for additions to tax as follows:  Under section 6651(a), $1,352 for 1990 and $388 for 1992; and, under section 6654, $305 for 1990

and $55 for 1992. Thus, respondent has conceded that petitioners are not liable for additions to tax in excess of the amounts in the stipulation. Further, for 1990 and 1992 petitioners have conceded that with respect to the additions under section 6651(a), their failure to file tax returns was not due to reasonable cause; and, with respect to the additions under section 6654, they do not qualify for any exceptions to the additions in section 6654(e). The only remaining matters with respect to additions to tax are computational, which can be addressed in the Rule 155 computation.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.